151 P.3d 764

**STATE of Hawai'i, Plaintiff–Appellee**

v.

**Raymond J. HEAPY, Defendant– Appellant.**

No. 27375.

Supreme Court of Hawai'i.

Jan. 11, 2007.

Michelle L. Drewyer (Ranken & Drewyer), Wailuku, for defendant-appellant.

Peter A. Hanano, Deputy Prosecuting Attorney, County of Maui, for plaintiff-appellee.

ACOBA and DUFFY, JJ.; with LEVINSON, J., concurring separately, and with whom NAKAYAMA, J., joins; and MOON, C.J., dissenting.

1. The Honorable Barclay E. MacDonald presided.

2. Article I, section 7 of the Hawai'i Constitution is identical to the Fourth Amendment to the United States Constitution. In relevant part, article I, section 7 provides that "[t]he right of the people to be secure in their persons ... against

Opinion by ACOBA, J.

We hold that the district court of the second circuit (the court)[1] was wrong in denying the motion of Defendant–Appellant Raymond J. Heapy (Defendant) to suppress "all of the evidence and statements obtained as a result of the police stop of [his] vehicle" because (1) the purported investigatory stop by the police violated article I, section 7 of the Hawai'i Constitution[2] in as much as it was not supported by a reasonable and articulable suspicion that Defendant was engaged in criminal conduct and (2) the "chase car" police procedure of stopping all vehicles that lawfully turn onto a public way in advance of a checkpoint exceeded that statutorily authorized. Therefore, the court's June 7, 2005 order denying Defendant's motion to suppress is vacated and the case is remanded to the court with instructions to enter an order granting Defendant's motion to suppress and to allow Defendant to withdraw his conditional no contest plea. See State v. Kealaiki, 95 Hawai'i 309, 314 & n. 6, 22 P.3d 588, 593 & n. 6 (2001) (observing "that in the case where the pretrial motion seeks to suppress the evidence incriminating the defendant and the appeal is decided against the government, the proceedings would also ordinarily come to an end, the question appealed being the underlying predicate reason for the conditional plea" and that Hawai'i Rules of Penal Procedure (HRPP) "Rule 11(a)(2) contemplates by its terms that the case would be remanded to allow withdrawal of the conditional plea, after which ... dismissal [may] follow because of the absence of the evidence suppressed").

I.

■ It is axiomatic that reasonable suspicion to justify a stop must relate to criminal activity. See, e.g., State v. Eleneki, 106 Hawai'i 177, 180, 102 P.3d 1075, 1078 (2004) (stating that a seizure or stop based on rea-

unreasonable ... seizures and invasions of privacy shall not be violated[.]" The Fourth Amendment to the United States Constitution states that "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures, shall not be violated."

sonable suspicion must be "*tied to 'some objective manifestation* that the person stopped is, or is about to be, engaged in criminal activity'" (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (emphasis added))). The criminal activity for which Defendant was stopped was operating a vehicle under the influence of an intoxicant (OVII or DUI), Hawai'i Revised Statutes (HRS) § 291E-61(a) (Supp.2005).[3] However, the officer observed no acts indicating a violation of the statute before the stop. He therefore lacked any objective basis—specific and articulable facts—that Defendant was violating HRS § 291E-61(a) so as to justify the stop. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (stating that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"). Accordingly the officer had no grounds for *reasonably believing criminal activity was afoot. See, e.g., State v. Trainor*, 83 Hawai'i 250, 256, 925 P.2d 818, 824 (1996) (ruling that "the police may temporarily detain an individual if they have a reasonable suspicion based on specific and articulable facts that criminal activity is afoot" (citation omitted)). Because such objective grounds were absent, no legal support existed for the stop. *See Eleneki*, 106 Hawai'i at 180, 102 P.3d at 1078. The stop therefore was unlawful. Additionally, in stopping vehicles turning in advance of the checkpoint, the procedure exceeded the authority granted to the police to establish roadblocks under HRS §§ 291E-19 and -20 (Supp.2005).[4] Since the stop was unlawful all evidence derived from the stop must be suppressed. *See State v. Aguinaldo*, 71 Haw. 57, 61, 782 P.2d 1225, 1228 (1989) (noting that "fruits of an 'unlawful seizure' are 'proper subjects of a suppression order'" (quoting *State v. Powell*, 61 Haw. 316, 320, 603 P.2d 143, 147 (1979))).

## II.

In reaching today's holding we do not ignore the important State interest in combating drunken driving. *See Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (stating that "[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it"). We emphasize that our ruling does not affect established roadblock procedures authorized by statutes. As to the practice in issue here, however, "[w]e may not," as the U.S. Supreme Court has instructed, "vitiate constitutional guarantees when they have the effect of allowing the guilty to go free." *Davis v. Washington*, —— U.S. ——, 126 S.Ct. 2266, 2280, 165 L.Ed.2d 224 (2006) (citing *Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)).

As was stated in the seminal case of *Terry*, " '[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' "

3. Hawai'i Revised Statutes (HRS) § 291E-61 (Supp.2005), entitled "Operating a vehicle under the influence of an intoxicant," provides in relevant part:
 (a) *A person commits the offense of operating a vehicle under the influence of an intoxicant if the person operates or assumes actual physical control of a vehicle:*
 (1) While under the influence of alcohol in an amount sufficient to impair the person's normal mental faculties or ability to care for the person and guard against casualty;
 . . . .
 (3) With .08 or more grams of alcohol per two hundred ten liters of breath; or
 (4) With .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood.

(Emphasis added.) Defendant asserts that he entered a conditional plea under HRS § 291E-61(a)(3). Plaintiff-Appellee State of Hawai'i (the prosecution), however, states that Defendant was charged with violating HRS § 291E-61(a)(4) and does not specify under which section Defendant entered his conditional plea.
 HRS § 291E-61 criminalizes operating a vehicle under the influence of the requisite amount of alcohol, not evading an intoxication checkpoint. As such, an officer must have specific and articulable facts that would lead a person of reasonable caution to believe that the defendant was operating a vehicle under the influence of alcohol.

4. The relevant provisions of HRS §§ 291E-19 and -20 are reproduced *infra*.

392 U.S. at 9, 88 S.Ct. 1868 (quoting *Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891)). Today's holding reaffirms the precepts established in *Terry* and its progeny which we have adopted, and the longstanding constitutional protections in our jurisdiction that have stood as a bulwark against unreasonable seizures. *See e.g., State v. Perez,* 111 Hawai'i 392, 397, 141 P.3d 1039, 1044 (2006); *Eleneki,* 106 Hawai'i at 180, 102 P.3d at 1078; *Powell,* 61 Haw. at 321, 603 P.2d at 147–48; *State v. Bonds,* 59 Haw. 130, 133, 577 P.2d 781, 784 (1978); *State v. Ogata,* 58 Haw. 514, 572 P.2d 1222 (1977); *State v. Barnes,* 58 Haw. 333, 568 P.2d 1207 (1977); and *State v. Goudy,* 52 Haw. 497, 479 P.2d 800 (1971).[5]

### III.

Defendant was charged on August 4, 2004 with violating HRS § 291E–61 by

operat[ing] or assum[ing] actual physical control of a vehicle while under the influence of an intoxicant meaning that he was under the influence of alcohol in an amount sufficient to impair his normal mental faculties or ability to care for himself and guard against casualty, and/or [by] operat[ing] or assum[ing] actual physical control of a vehicle with .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood, thereby committing the offense of Operating a Vehicle Under the Influence of an Intoxicant in violation of Section 291E–61 of the [HRS].

On August 11, 2004, Defendant filed a "Motion to Suppress Evidence" contending that "[s]upression is required because the stop of Defendant's vehicle lacked probable cause or even reasonable suspicion, and therefore the nature and scope of the intrusion into Defendant's liberty and privacy ex-

ceeded what was constitutionally permissible in light of the facts known to police at the time." Defendant requested that "[a]ll evidence and statement [sic] garnered as a result of the stop be suppressed and the matter dismissed."

On February 18, 2005, the court held a hearing on Defendant's motion to suppress. At the hearing, the prosecution called Maui Police Department Officer Eric Correa (Officer Correa) as a witness. At the end of the hearing, the court orally denied the motion to suppress. That same day, Defendant entered a conditional no contest plea pursuant to HRPP Rule 11(a)(2). Following Defendant's conditional plea, the court sentenced Defendant. On June 7, 2005, the court entered its written Findings of Fact, Conclusions of Law, and Order Denying Defendant's Motion to Suppress Evidence (Order). On June 9, 2005, Defendant filed a Notice of Appeal.

### IV.

 On appeal, Defendant contends "it was error for the district court judge to find reasonable suspicion existed because it appeared to [Officer] Correa that [Defendant] was attempting to avoid the intoxication checkpoint." In response, the prosecution maintains that "appellate jurisdiction does not exist where a notice of appeal is filed in violation of time limitations prescribed under [Hawai'i Rules of Appellate Procedure (HRAP) Rule] 4(b)" and "[e]ven assuming *arguendo,* this court has jurisdiction in this matter, the trial court did not err in denying [Defendant's] Motion to Suppress Evidence." As to the prosecution's first response, we believe jurisdiction may be exercised in this case.[6]

As even the police admitted, in this case, no criminal activity was observed and the record does not indicate the police had any prior knowledge of any "involvement in criminal activity." At best the dissent's characterization is a misunderstanding of this decision. Hence, there is no "abrogation" of the State's interest, dissent at 306, 151 P.3d at 787, in public safety, as the dissent maintains.

---

5. Hence, the dissent's reference to a bright-line rule that abrogates the State's interest in combating intoxicated motorists is a misstatement of the case law and of our adherence to the rule of law. As is apparent, this case addresses intoxication checkpoints and not "some involvement in [unspecified] criminal activity," dissenting at 306, 151 P.3d at 787, as the dissent states. If the police have information that persons are "intentionally avoiding a checkpoint *because* of involvement in criminal activity," dissent at 306, 151 P.3d at 787 (emphasis added), they would perforce have reasonable suspicion to make a stop.

6. In district court criminal cases, "[a]ppeals upon the record shall be allowed from all final

## V.

As to Defendant's appeal and the prosecution's second response, we vacate the court's order denying the motion to suppress. The court's relevant findings are as follows:

1. On June 16, 2004, at approximately 1830 Hours, *[Officer Correa] was stationed as the "chase car" at an intoxication checkpoint being conducted by the Maui Police Department on Mokulele Highway* just south of the intersection of Mokulele Highway and Mehameha Loop;

2. Officer Correa has been employed with the Maui Police Department for twelve years and is currently assigned the traffic division;

3. Officer Correa was formerly a member for the DUI Task Force unit for four years;

4. Officer Correa has participated in approximately 50 intoxication checkpoints;

5. Officer Correa estimated that he has been assigned the "chase car" position approximately 20 times;

6. *Officer Correa indicated that he has effected approximately 40 stops on cars that attempted to avoid the intoxication checkpoint;*

7. *That in every case the individual avoiding the intoxication checkpoint was* either intoxicated or was violating the law in some other way such as, not having vehicle insurance or drivers license, or having an outstanding warrant;

8. *The intoxication checkpoint was in place to stop vehicle's traveling southbound on Mokulele Highway in a numerical pattern to check for signs of intoxication;*

9. *Officer Correa was stationed just north of the intoxication checkpoint and was tasked with observing traffic and making stops based on probable cause;*

10. Drivers approaching the intoxication checkpoint were made aware of the impending checkpoint by two four foot by four foot, fluorescent orange, diamond shaped, signs with the words "INTOXICATION CHECKPOINT" in black, block letters;

11. These signs were positioned approximately five hundred feet and two hundred and fifty feet from the checkpoint respectively and facing all southbound traffic;

12. The intoxication checkpoint itself was illuminated by a large portable lighting tower with several high powered Halogen lights illuminating the intoxication checkpoint;

decisions and final judgments." HRS § 641–12 (1993). "[T]he notice of appeal shall be filed in the ... district ... court within 30 days after the entry of the judgment or order appealed from." HRAP 4(b)(1). "A judgment or order is entered within the meaning of [HRAP 4(b)(1)] when it is filed with the clerk of the court." HRAP 4(b)(3).

The "Notice of Entry of Judgment" filed by the district court clerk on February 18, 2005 constitutes the written judgment on Defendant's conviction that is appealable pursuant to HRS § 641–12. The denial of the motion to suppress evidence is reviewable on appeal from the February 18, 2005 judgment pursuant to HRPP 11(a)(2).

The notice of appeal filed by counsel on June 9, 2005 was filed more than thirty days after entry of the February 18, 2005 judgment and was untimely. However, in criminal cases governed by HRAP 4(b)(1), we have made exceptions to the requirement that the notice of appeal be timely filed. One recognized exception that we apply here excuses the failure to timely file a notice of appeal when untimely filing was the result of counsel's failure to competently pursue the defendant's first appeal from a criminal conviction.

*State v. Knight,* 80 Hawai'i 318, 323–24, 909 P.2d 1133, 1138–39 (1996) (citing *State v. Erwin,* 57 Haw. 268, 554 P.2d 236 (1976)).

The prosecution argues on appeal that because Defendant failed to properly perfect his notice of appeal when he indicated that he was appealing from a March 18, 2005 "Notice of Entry of Judgment and/or Order and Plea/Judgment" instead of the February 18, 2005 "Notice of Entry of Judgment," and incorrectly stated that his appeal was brought pursuant to HRS § 641–11 (1993) which pertains to criminal appeals from a circuit court, this court lacks jurisdiction. We have stated that "a mistake in designating the judgment ... should *not* result in loss of the appeal as long as *the intent to appeal from a specific judgment can be fairly inferred from the notice and the appellee is not misled by the mistake.*" *State v. Bohannon,* 102 Hawai'i 228, 235, 74 P.3d 980, 987 (2003) (internal quotation marks and citation omitted) (emphases in original). Therefore, inasmuch as the prosecution has not argued that it was misled by Defendant's error, and it was evident as to which judgment Defendant was appealing from, we are not divested of appellate jurisdiction.

13. Approaching traffic was directed by a flag officer equipped with reflective vest, white gloves, and a flashlight with a red, plastic, cone over the illuminated portion of the flashlight;

14. Officer Correa observed a 2004, silver, Ford, Mustang, convertible, bearing State of Hawai'i license Plate number MLX–761 (target vehicle) traveling southbound towards the intoxication checkpoint;

15. Officer Correa observed the target vehicle to pass the two four foot by four foot diamond shaped signs described above;

16. Officer Correa observed the target vehicle to effect a right turn onto the Mehameha Loop after it had passed both of the above described signs but before reaching the flag officer for the intoxication checkpoint;

17. Officer Correa indicated that the above mentioned tower lighting and flag officer were fully visible from the intersection of Mokulele Highway and Mehameha Loop;

18. *Officer Correa indicated that he did not recall whether the [D]efendant used his turn signal or not, that he did not observe a suspicious driving pattern as the target vehicle approached on Mokulele Highway, or thereafter, and that the turn was not effected in an illegal manner;*

19. Officer Correa testified that Mehameha Loop is approximately a quarter of a mile long which terminates with a bright yellow, pipe metal, gate blocking the roadway;

20. Mehameha Loop is surrounded on both sides by sugarcane fields;

21. Officer Correa indicated that the only structure located on Mehameha Loop is the animal shelter which was not open for business at the time of the incident;

22. Officer Correa testified that after he observed the target vehicle turn down Mehameha Loop he immediately turned down Mehameha Loop and began closing the distance between himself and the target vehicle;

23. Officer Correa indicated that he did not turn on his emergency lights and/or siren at that time;

24. Officer Correa testified that he observed Defendant to pass the entrance to the animal shelter and continue driving toward the metal gate;

25. Officer Correa testified that he could see the metal gate from his position behind the target vehicle, that there are no further structures located on the Mehameha Loop, but that the target vehicle did not appear to be changing course or speed and continued driving toward the gate;

26. Officer Correa indicated that after the target vehicle passed the entrance to the animal shelter without making any attempts to turn he activated his emergency lights and effected a traffic stop;

27. Upon making the stop Officer Correa observed [Defendant] to be the operator of the vehicle;

28. *Officer Correa testified that he did not observe any traffic violations with regard to the target vehicle prior to the stop;*

29. *Officer Correa testified that the sole reason for stopping the target vehicle was that based upon his training and experience, he felt he had reasonable suspicion to stop the target vehicle because he thought it was avoiding the roadblock;*

30. Officer Correa testified that he was not officially part of the roadblock as he was assigned to park before the roadblock and be a "chase car," meaning that he was to pursue cars which tried to avoid the roadblock.

(Emphases added.)

The court's relevant conclusions of law are as follows:

8. The stop of Defendant was conducted without the authority of a warrant.

9. *The Legislature had public safety concerns in mind when they [sic] enacted HRS § 291E–20 allowing police to conduct intoxication checkpoints.*

10. Where intoxicated drivers are allowed to avoid checkpoints by turning around and returning the way they came that the public's safety is still at risk and the purpose of the checkpoint is not met.

*See State v. Forman,* [351 N.C. 627,] 527 S.E.2d 921 924 (N.C.2001).

11. When the stop occurred after Defendant passed two signs announcing the impending intoxication checkpoint, turned down an isolated, gated, dead end road surrounded by sugarcane, with only one structure to be found on the road, just prior to reaching the flag officer where Defendant might be stopped, and [D]efendant passed by the only entrance to the only structure on the roadway, and based on Officer Correa's training and experience, that the officer did have reasonably articulable facts which would warrant a man of reasonable caution to harbor a reasonable suspicion that criminal activity was afoot. *See id.; State v. Thill,* 474 N.W.2d 86, 87 (S.D.1991); *Steinbeck v. Commonwealth,* 862 S.W.2d 912, 913–14 (Ky.Ct.App.1993).

12. Based upon all the findings of fact, *supra,* the [c]ourt finds that the [prosecution] has met its burden of proof and shown that Officer Correa's stop of the Defendant's vehicle fell within one of the exceptions to the warrant requirement of the Fourth and ... Fourteenth Amendment to the United States Constitution, and Article I, Section 7 of the Hawaii State Constitution.

ACCORDINGLY, IT IS HEREBY ORDERED that the Defendant's Motion to Suppress Evidence is denied.

(Emphasis added.) (Capitalization in original.)

## VI.

■ The subject stop of Defendant's vehicle violated article I, section 7 of the Hawai'i Constitution which protects "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures and invasions of privacy[.]" This court has held that "[a] stop of a vehicle for an investigatory purpose constitutes a seizure within the meaning of the constitutional protection against unreasonable searches and seizures." *State v. Bolosan,* 78 Hawai'i 86, 92, 890 P.2d 673, 679 (1995) (citing *Kernan v. Tanaka,* 75 Haw. 1, 37, 856 P.2d 1207, 1225 (1993)). "A warrantless seizure *is presumed invalid*

[and, thus, unreasonable,] 'unless and until the prosecution proves that the ... seizure falls within a well-recognized and narrowly defined exception to the warrant requirement.' " *Eleneki,* 106 Hawai'i at 180, 102 P.3d at 1078 (quoting *State v. Prendergast,* 103 Hawai'i 451, 454, 83 P.3d 714, 717 (2004)) (emphasis added) (citation omitted). As observed in *Eleneki,* a "narrowly defined exception to the warrant requirement ... is that a police officer may stop an automobile and detain its occupants if that officer has a 'reasonable suspicion' that the person stopped *was engaged in criminal conduct."* *Id.* (quoting *Prendergast,* 103 Hawai'i at 454, 83 P.3d at 717 (citation omitted)) (internal quotation marks omitted) (emphasis in original).

*Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), established that a highway stop must be based, at the minimum, on specific and articulable facts of criminal activity.

*When there is not probable cause* to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations—*or other articulable basis amounting to reasonable suspicion* that the driver is unlicensed or his vehicle unregistered—*we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver.* This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.

(Citing *Almeida–Sanchez v. United States,* 413 U.S. 266, 270, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *Camara v. Mun. Court,* 387 U.S. 523, 532–33, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).) (Emphases added.) (Footnote omitted.) Thus, it was held that a stop without "at least articulable and reasonable suspicion" violated the constitutional prohibition against unreasonable seizures:

[W]e hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is

unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

*Id.* at 663, 99 S.Ct. 1391 (emphasis added). Under *Prouse,* then, individualized suspicion-less stops are prohibited unless "articulable and reasonable suspicion" exists which indicates the presence of criminal activity. *Id. Prouse* explained that "[t]he essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions[.]' " *Id.* at 653–54, 99 S.Ct. 1391 (quoting *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (citation omitted)).

Subsequently, in *Terry,* the Court held that in order to justify an intrusion on the constitutionally protected interests of a private citizen by a police officer, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 21, 88 S.Ct. 1868. The Court declared that the facts of a case must be judged against an objective standard, *i.e.,* "would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate[,]" . . . [because if] simple good faith on the part of the arresting officer . . . were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers and effects, only in the discretion of the police." *Id.* at 21–22, 88 S.Ct. 1868 (internal quotation marks, footnote, and citations omitted).

*Prouse* observed that "[a]n individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation." 440 U.S. at 662, 99 S.Ct. 1391. Thus, the Court noted that, "[a]s [*Terry* ] recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks . . . [, n]or are they shorn of those interests when they step from the sidewalks into their automobiles." *Id.* at 663, 99 S.Ct. 1391 (citing *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).

Hawai'i has adopted the *Terry* reasonable suspicion test on independent state constitutional grounds and applied it to traffic situations. *See State v. Kim,* 68 Haw. 286, 290, 711 P.2d 1291, 1294 (1985) (holding that "under article I, section 7 of the Hawaii Constitution, a police officer must have at least a reasonable basis of specific articulable facts to believe a crime has been committed to order a driver out of a car after a traffic stop"). Thus, the principles of *Prouse* as they apply to vehicle stops on public ways rest on independent state constitutional grounds afforded by article I, section 7. *See Powell,* 61 Haw. at 320, 603 P.2d at 147 (noting that "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the Fourth Amendment to the United States Constitution and [a]rticle I, [s]ection 7 of the Hawaii Constitution, even though the purpose of the stop is limited and the resulting detention is brief" (footnote and citations omitted)).[7]

In regard to highway stops, then, " 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *Eleneki,* 106 Hawai'i at 180, 102 P.3d at 1078 (quoting *Prendergast,* 103 Hawai'i at 454, 83 P.3d at 717) (citation omitted). Accordingly,

7. Accordingly, the analysis in this opinion is grounded in article I, section 7 of the Hawai'i Constitution. *See Michigan v. Long,* 463 U.S. 1032, 1039 n. 4, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (stating that, " 'where the judgment of a state court rests upon two grounds, one of which is federal and the other non-federal in character, our jurisdiction fails if the non-federal ground is independent of the federal ground and adequate to support the judgment' " (quoting *Fox Film Corp. v. Muller,* 296 U.S. 207, 210, 56 S.Ct. 183, 80 L.Ed. 158 (1935))).

as mentioned before, a vehicular seizure or stop based on reasonable suspicion must be "tied to 'some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity[.]' " *Id.* (quoting *Cortez,* 449 U.S. at 417, 101 S.Ct. 690). Such a reasonable suspicion "must be present before a stop[,]" in order for the stop to be permissible. *Cortez,* 449 U.S. at 418, 101 S.Ct. 690

## VII.

 The findings of the court and the evidence before it conclusively established that Defendant was stopped without reasonable and articulable suspicion that he was operating a vehicle under the influence of alcohol. The totality of the circumstances, measured by an objective standard, must indicate that *criminal activity is afoot. See Prendergast,* 103 Hawai'i at 454, 83 P.3d at 717 (citing *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to *see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.*"); (citing *Barnes,* 58 Haw. at 338, 568 P.2d at 1211 ("The ultimate test in these situations must be whether from these facts, measured by an objective standard, a man of reasonable caution would be warranted in believing that criminal activity *was afoot* and that the action taken was appropriate." (Emphasis added.))). Under this objective·standard, Officer Correa did not possess "specific and articulable facts" before the stop giving rise to a "reasonable

suspicion" that Defendant was at the time breaking the law, here, operating a vehicle while intoxicated. *See Eleneki,* 106 Hawai'i at 180, 102 P.3d at 1078.

The court's undisputed finding no. 18 is that "Officer Correa . . . did *not* observe a suspicious driving pattern as [Defendant's] vehicle approached [the checkpoint], or thereafter, [or] that the turn [made by Defendant] was effected in an illegal manner[.]" (Emphasis added.) The court's undisputed finding no. 28 is that "*Officer Correa testified that he did not observe any traffic violations with regard to [Defendant's] vehicle prior to the stop.*" (Emphasis added.) The court's undisputed finding no. 29 is that "Officer Correa testified that *the sole reason for stopping [Defendant's] vehicle was that[,] based on his training and experience, he felt that he had a reasonable suspicion to stop [Defendant's] vehicle because he thought he was avoiding a roadblock.*" (Emphasis added.) In sum then, Officer Correa did not observe Defendant driving in a suspicious manner or commit any criminal or traffic violation in the operation of his vehicle. Defendant made a legal right turn onto a paved roadway. Apparently the turn was not made erratically, and his headlights were on. Furthermore, even as Officer Correa followed Defendant, he did not observe Defendant driving suspiciously or in an erratic manner. Accordingly, Officer Correa had no basis to have a reasonable suspicion that criminal activity was afoot.[8]

Viewed in its best light, then, the only suspicion Officer Correa had was that Defendant was attempting to avoid a roadblock, not that he was driving under the influence of an intoxicant.[9] The mere possibility o·' criminal activity does *not* satisfy the constitu·

---

8. Defendant argued that he is not from Maui and was driving a rental car, and that Officer Correa testified that Defendant informed him that Defendant was lost.

9. Because the dissent cites to *Murphy v. Commonwealth,* 9 Va.App. 139, 384 S.E.2d 125 (1989) in support of its decision, we discuss it. *See* dissent at 312 n. 3, 151 P.3d at 793 n. 3. However, in that case, the Virginia Court of Appeals concluded that "*the act of a driver in making a lawful right turn 350 feet before a roadblock does not give rise to a reasonable suspicion of criminal activity unless the driver's turn or*

action is coupled with other articulable facts such as erratic driving, a traffic violation, or some behavior which independently raises suspicion of criminal activity." 384 S.E.2d at 128 (citations omitted) (emphasis added). Likewise, in this case, Defendant's right turn 250 feet before the roadblock did not give rise to a reasonable suspicion of criminal activity. *See id.* Defendant's turn was not "*coupled with*" any "behavior which independently raise[d] suspicion of criminal activity," for it cannot be said that lawfully driving down a road "independently raises suspicion of criminal activity." *Id.* (emphasis added)

tional requirement that a stop be based on suspicion "that criminal activity was afoot," *Trainor*, 83 Hawai'i at 258, 925 P.2d at 826; *Barnes*, 58 Haw. at 338, 568 P.2d at 1211, or that "legal wrongdoing" was taking place or about to take place, *Prendergast*, 103 Hawai'i at 454, 83 P.3d at 717 (citation omitted).

Manifestly, the fact that Defendant exhibited signs of intoxication *after* the stop does not retroactively justify the stop. *See, e.g.*, *State v. Kido*, 109 Hawai'i 458, 462, 128 P.3d 340, 344 (2006) (stating that "[i]ndeed, prior decisions of this court confirm that subsequent events can neither support nor invalidate the existence of probable cause at the time of the search or seizure" and that "[t]his court has held that subsequent events cannot *justify* a search or seizure if probable cause was lacking at the time search or seizure was conducted" (citation omitted) (emphasis in original)); *State v. Maldonado*, 108 Hawai'i 436, 445, 121 P.3d 901, 910 (2005) (noting that " '[a]ssuming an unreasonable search or seizure, any evidence derived therefrom is inadmissible in a criminal prosecution, and a conviction obtained thereby must be reversed' " (quoting *State v. Wallace*, 80 Hawai'i 382, 393, 910 P.2d 695, 706 (1996))); *State v. Phillips*, 67 Haw. 535, 541, 696 P.2d 346, 351 (1985) (adopting the rule that "[a] search is not to be made legal by what it turns up" and that a search "is good or bad when it starts and does not change character from its success" (internal quotation marks and citation omitted)); *Kim*, 68 Haw. at 290, 711 P.2d at 1294–95 (ruling that "[a]n invalid search or seizure is not subsequently validated by what it produces" (citation omitted)).

## VIII.

The stop involved herein, then, did not fall "within a well-recognized and narrowly defined exception to the warrant requirement," *Eleneki*, 106 Hawai'i at 180, 102 P.3d at 1078 (internal quotation marks and citations omitted), and thus violated the proscription in article I, section 7 of the Hawai'i Constitution against unreasonable seizures. The court's ruling, then, subverted the reasonable suspicion standard because it authorized a stop based on non-criminal activity. Hence, the ruling would abrogate the "reasonable and articulable" suspicion standard by allowing stops on suspicion of conduct having nothing to do with criminal activity.

## IX.

Indeed the majority of other jurisdictions have held, based on the facts presented, that it is not permissible to pursue and detain drivers of motor vehicles appearing to legally avoid sobriety checkpoints.[10] *See Howard v. Voshell*, 621 A.2d 804, 807 (Del.Su-

---

10. The dissent cites to *State v. Thill*, 474 N.W.2d 86 (S.D.1991), and quotes from the following passage:

Notwithstanding the general freedom to avoid police confrontation, we find the avoidance of the police roadblock *in this instance* was sufficient to create an articulable and reasonable suspicion of criminal activity. Automobiles and their use on state roads are the subject of significant state regulation (*e.g.*[,] licensing, registration). This fact distinguishes the cases relied upon in *[State v. Talbot*, 792 P.2d 489 (Utah Ct.App.1990)]*, the majority of which involved pedestrians. And while people are not shorn of their Fourth Amendment protection when they step from the sidewalks into their automobiles, *Prouse*, 440 U.S. at 663[, 99 S.Ct. 1391,] their actions on the road become subject to increased state regulation and restriction. Consequently, actions taken on the road, the character of which would be innocent in another context, may well give rise to an articulable and reasonable suspicion of a violation of the law respecting the use or ownership of an automobile.

474 N.W.2d at 88 (emphasis added); dissent at 311, 151 P.3d at 795. However, *Prouse* said, "An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy *simply because the automobile and its use are subject to government regulation.*" 440 U.S. at 662, 99 S.Ct. 1391 (emphasis added). *Thill* misstates *Prouse* in attempting to distinguish the statement in *Talbot*, that "[t]he majority of jurisdictions which have addressed the issue of flight have held that the mere act of avoiding confrontation does not create an articulable suspicion" as relating only to pedestrian traffic. 792 P.2d at 493–94 (citations omitted). Instead, *Prouse* pointed out that "[m]any people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, *many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian* or other modes of travel." 440 U.S. at 662, 99 S.Ct. 1391 (emphasis added). Thus, *Prouse* did not draw a distinction between the requirements for pedestrian, as opposed to vehicle seizures, that *Thill* seeks to make.

294

per.Ct.1992) (stating that, "[a]s to the general issue of avoiding police confrontations, *[t]he majority of jurisdictions* which have addressed the issue of flight have held that the mere act of avoiding confrontation does not create an articulable suspicion" (emphasis added)); *People v. Bigger*, 2 Misc.3d 937, 771 N.Y.S.2d 826, 831 (N.Y.Just.Ct.2004) (holding that a police officer lacked objective articulable reason to stop defendant's vehicle on ground that defendant turned around in attempt to evade sobriety checkpoint, where officer was not part of sobriety checkpoint detail, there was no written established procedure for stopping motorists who appeared to be evading sobriety checkpoints, and defendant was driving his vehicle in no apparent violation of any law); *Commonwealth v. Scavello*, 557 Pa. 429, 734 A.2d 386, 388 (1999) (noting that, where "there is no requirement that a driver go through a roadblock[, f]ailing to go through the roadblock in and of itself ... provides no basis for police intervention" (footnote omitted)); *Talbot*, 792 P.2d at 493–94 (recognizing that "[t]he majority of jurisdictions which have addressed the issue of flight have held that the mere act of avoiding confrontation does not create an articulable suspicion" (citations omitted)).

## X.

Additionally, as noted previously, it has been expressed that "[t]he majority of jurisdictions which have addressed the issue of flight have held that the mere act of avoiding confrontation does not create an articulable suspicion." *Talbot*, 792 P.2d at 493–94 (citing *Hinton v. United States*, 424 F.2d 876, 879 (D.C.Cir.1969) (ruling that "flight [is not] a reliable indicator of guilt without other circumstances to make its import less ambiguous"); *People v. Thomas*, 660 P.2d 1272, 1276 (Colo.1983) (en banc) (stating that "an effort to avoid police contact, by itself, is insufficient to support a stop"); *In re D.J.*, 532 A.2d 138, 141 (D.C.App.1987) (observing that the defendant "merely attempted to walk away, behavior indicative simply of a desire

not to talk to police" and that "[n]o adverse inference may be drawn from such a desire"); *McClain v. State*, 408 So.2d 721, 722 (Fla. Dist.Ct.App.1982) (noting that defendant's "behavior which, taken for its most insidious implications, indicated only that he wanted to avoid police, [and] could not give rise to a reasonable suspicion that he was engaged in criminal activity"); *People v. Fox*, 97 Ill. App.3d 58, 52 Ill.Dec. 219, 421 N.E.2d 1082, 1086 (1981) (stating that "the mere fact that the vehicle drove away at the approach of a squad car does not serve as a justifiable basis for conducting a *Terry* stop"); *State v. Hathaway*, 411 So.2d 1074, 1079 (La.1982) (ruling that "[e]ven where flight ... reasonably appear[s] designed to avoid apprehension, reasonable cause will not arise unless flight" is coupled with other indicia of criminality); *People v. Shabaz*, 424 Mich. 42, 378 N.W.2d 451, 460 (1985) (determining that flight "does not alone supply the particularized, reasoned, articulable basis to conclude that criminal activity [is] afoot")). *See also Little v. State*, 300 Md. 485, 479 A.2d 903, 906 (1984) (noting that pursuant to Maryland's policy regarding intoxication checkpoints, "[a] motorist wishing to avoid a sobriety checkpoint may make a U-turn or turn onto a side road prior to reaching the roadblock" and that "[n]o action is taken against a driver doing so unless the motorist drives erratically"); *State v. McCleery*, 251 Neb. 940, 560 N.W.2d 789, 793 (1997) (concluding that the police officers did not have a reasonable suspicion to stop the defendant's car solely because she appeared to be evading an intoxication checkpoint in light of Nebraska's adherence to "The Use of Sobriety Checkpoints for Impaired Driving Enforcement," (Nov.1990) of the National Highway Traffic Safety Administration (NHTSA) [hereinafter, the Guide], which provides that "[a] motorist who wishes to avoid the checkpoint by legally turning before [entering] the checkpoint area should be allowed to do so unless a traffic violation(s) is observed or probable cause exists to take other action").[11]

11. The dissent states that there is a "split on whether avoiding a roadblock or checkpoint alone creates sufficient reason for a traffic stop." Dissent at 307, 151 P.3d at 788 (quoting *Oughton v. Dir. of Revenue*, 916 S.W.2d 462, 464 n. 2

(Mo.Ct.App.1996)). Conversely, we observe that the view that avoidance of a roadblock or checkpoint can provide the sole basis for a traffic stop appears to be a distinctly *minority position*. In *Oughton*, the Missouri Court of Appeals based its

There are a multitude of reasons for making a turn similar to the present case as pointed out by other jurisdictions. *See Bass v. Commonwealth,* 259 Va. 470, 525 S.E.2d 921, 925 (2000) (stating that "[t]he reasons for which a driver may reverse direction other than to evade a traffic checkpoint are legion in number and are a matter of common knowledge and experience"). It has been observed that "citizens will avoid contact with police for reasons other than fear of being caught for a crime they have committed" and that "[a] completely innocent person may wish to avoid the delay which a discussion with police may entail; others have a fear of police authority; still others resent and seek to avoid the 'hassle' of a stop which lacks any basis." *Talbot,* 792 P.2d at 494 n. 11.[12]

### A.

With respect to the court's reference to Officer Correa's experience with forty or so previous stops, the following has been stated:

conclusion that "[t]he majority position appears to be that such avoidance can provide the *sole* basis for such a stop" on seven cases. 916 S.W.2d at 464 n. 2 (citing *Coffman v. State,* 26 Ark.App. 45, 759 S.W.2d 573 (1988); *Smith v. State,* 515 So.2d 149 (Ala.Crim.App.1987); *Snyder v. State,* 538 N.E.2d 961 (Ind.Ct.App.1989); *Steinbeck,* 862 S.W.2d 912; *Boches v. State,* 506 So.2d 254 (Miss.1987); *Thill,* 474 N.W.2d 86; *Stroud v. Commonwealth,* 6 Va.App. 633, 370 S.E.2d 721 (1988) (emphasis in original)). However, at least five of these seven cases do not support such a conclusion, and the remaining two would not constitute a majority.

In *Smith, Snyder, Steinbeck, Thill,* and *Stroud,* there were facts in addition to the avoidance of the roadblock or checkpoint which gave rise to reasonable suspicion for the stop. *See Smith,* 515 So.2d at 150 (the officer observed the driver avoid the roadblock, and turn rapidly into a private driveway, stopping fifty feet from the front door, and turning off his lights but not his engine while remaining in the car); *Snyder,* 538 N.E.2d at 965–66 (concluding that the officer's "experience gave him specific and articulable facts and inferences drawn therefrom to form a reasonable suspicion that [the driver] was committing a crime" but that "a driver who simply turns off the road before entering the roadblock may not give rise to a reasonable suspicion, unless coupled with other articulable facts such as erratic driving or traffic violations"); *Steinbeck,* 862 S.W.2d at 914 (concluding that the driver's "turn away from the sobriety checkpoint, coupled with the deputy sheriff's experience in

The fact that [the officer's] observation of [the motorist] gave rise to no more than an unparticularized suspicion or hunch *cannot be rehabilitated by adding to the mix of considerations the general statistics advocated by the [prosecution] on time, location, and special events from which a law enforcement officer would draw his inferences based on his training and experience.*

*State v. Roberson,* 163 N.C.App. 129, 592 S.E.2d 733, 737 (2004) (internal quotation marks and citations omitted) (emphasis added). Here, Officer Correa did not possess any reasonable or articulable basis to support a stop based on Defendant making a lawful turn onto Mehameha Loop.

This is not a case where erratic driving behavior or an infraction of a traffic rule was observed prior to the stop. Here, it is immaterial that "in every case [wherein Officer Correa effected approximately forty stops] the individual avoiding the checkpoint was

similar instances, the time of day, and the nature of the roadway onto which the appellant turned, constitute[d] specific, reasonable, and articulable facts which allowed the police officer to draw an inference sufficient to form a reasonable suspicion that the driver might have been engaging in criminal activity"); *Thill,* 474 N.W.2d at 88 (concluding that the driver's "turnabout at the entrance of the roadblock and his subsequent circuitous route constituted a reasonable suspicion that [the driver] was in violation of the law respecting the use or ownership of an automobile"); *Stroud,* 370 S.E.2d at 723 (concluding that based on the officer's "eleven years' experience with the state police, [the driver's] action in avoiding the roadblock indicated that he was probably unlicensed or otherwise in violation of the law").

It would be inaccurate to say that the remaining two cases cited to by the *Oughton* court, *Coffman* and *Boches,* are sufficient to support a "majority rule." Accordingly, we reject the conclusion in *Oughton* that "[t]he majority position appears to be that such avoidance can provide the *sole* basis for such a stop." 916 S.W.2d at 464 n. 2 (emphasis in original).

**12.** The dissent's totality of the circumstances analysis, *see* dissent at 311, 151 P.3d at 792, proves that, as known to the officer, no illegal activity took place. It ignores the fact that the same pre-stop circumstances can be explained by innocent behavior as recognized by other jurisdictions and would not amount to objective reasonable factors indicating criminal activity.

either intoxicated or was violating the law in some other way such as[ ] not having a vehicle insurance or [a] driver[']s license or having an outstanding warrant[,]" as the court found in finding no. 7. Because an objective basis for the stop was absent, no legal grounds existed for the stop and what was subsequently discovered cannot validate it. *See, e.g., Phillips,* 67 Haw. at 541, 696 P.2d at 351. The stop therefore was unlawful.

## B.

The dissent proposes a multi-factor test in support of the proposition that, taken together, "the evidence establishes sufficient specific and articulable facts upon which to base a reasonable suspicion that [Defendant] avoided the checkpoint to evade arrest or detection." Dissent at 311, 151 P.3d at 792. The factors the dissent points to are

(1) the motorist's distance from the roadblock when the turn or U-turn was made; (2) whether the motorist was able to see the roadblock before he or she took evasive action; (3) the manner in which the motorist operated his or her vehicle in making the evasive action; (4) the arresting officer's experience; and (5) any other circumstances that would indicate the motorist was intentionally avoiding the roadblock to evade arrest or detection.

Dissent at 307–08, 151 P.3d at 788–89. However, the factors identified by the dissent fail to provide any objective guidance as to the reasonable suspicion standard in the context of this case.

**13.** *See also Pooler v. Motor Vehicles Div.,* 88 Or.App. 475, 746 P.2d 716, 718 (1987) (holding that a legal U-turn before a roadblock does not by itself constitute reasonable suspicion); *Commonwealth v. Metz,* 412 Pa.Super. 100, 602 A.2d 1328, 1335 (1992) (holding that a motorist's avoidance or attempt to avoid a police checkpoint must be coupled with other facts in order to provide a police officer reasonable suspicion); *State v. Binion,* 900 S.W.2d 702, 703 (Tenn.Crim. App.1994) (stating that "the lawful turn without more does not give rise to reasonable suspicion"); *Murphy,* 384 S.E.2d at 128 (stating that "the act of a driver making a lawful right turn 350 feet before a roadblock does not give rise to a reasonable suspicion of criminal activity unless

### 1.

First, *all* of the cases that the dissent cites to in its factor analysis acknowledge that in some form or another, "a legal turn [before a roadblock], by itself is not sufficient to establish a reasonable, articulable suspicion." *State v. Foreman,* 351 N.C. 627, 527 S.E.2d 921, 923 (2000).[13] Although the court in *Binion* concluded that "where a motorist acts to avoid a roadblock, such action may by itself constitute reasonable suspicion that a criminal offense has been or is about to be committed[,]" it also determined that whether reasonable suspicion exists must be determined from a "totality of the circumstances on a case by case basis" and that "the lawful turn *without more does not give rise to reasonable suspicion.*" 900 S.W.2d at 703, 705, 706 (emphasis added).

In that case, where the driver executed a legal U-turn 1000 feet before the roadblock the court held that reasonable and articulable suspicion did *not* exist. *Id.* at 706. That court also noted that "it was significant that the roadblock was not 'controlled' in that approaching drivers could avoid the roadblock by making safe, legal U-turns." *Id.* Like the defendant in *Binion,* Defendant made a lawful turn prior to reaching a roadblock that was not "controlled" and which drivers could avoid by making safe, legal turns.

### 2.

Briefly, with respect to factor (1), "the distance from the roadblock" is not really one factor. Most of the cases cited by the dissent support a finding of no reasonable articulable suspicion, while the cases that do not do so are distinguishable.[14] The dissent

the driver's turn or action is coupled with other articulable facts, such as erratic driving, a traffic violation, or some behavior which independently raises suspicion of criminal activity" (citations omitted)).

**14.** *See State v. Powell,* 591 A.2d 1306, 1308 (Me. 1991) (holding that the lower court was not compelled to find the officer had a reasonable suspicion of criminal activity where a motorist turned around as much as 2100 feet before roadblock); *Binion,* 900 S.W.2d at 706 (holding that a motorist's lawful turn made 1000 feet before a roadblock did not give rise to reasonable suspicion of criminal activity); *Talbot,* 792 P.2d at 489 (determining that avoiding a roadblock did not

quotes *United States v. Lester,* which states, "Conversely, the closer a motorist is to a roadblock when he or she turns, the more objectively reasonable it may be to infer the turn was made out of a conscienceness of guilt." 148 F.Supp.2d 597, 603 (D.Md.2001); Dissent at 308, 151 P.3d at 789. However, in that case the court determined that "a *per se* rule ... has no place in Fourth Amendment jurisprudence." 148 F.Supp.2d at 603. Rather, the law dictates that *the [c]ourt should examine the specific facts of the case* to determine whether [the officer] had reasonable suspicion to justify the vehicle stop based on the *totality of the circumstances." Id.* at 602–03 (emphasis added). Neither the specific facts pointed to in *Lester* or the "totality of the circumstances" to support reasonable articulable suspicion were present in this case.

As to factor (2), notice of the roadblock, it is immaterial "whether a notice was posted ... [in order to determine] a driver's scienter of guilt." Dissent at 309, 151 P.3d at 790. Signs are meant to be seen and whether a motorist was cognizant of the sign does not objectively indicate guilt.

As to factor (3), the motorist's manner in operating his or her vehicle, provides no instruction at all. If the driver were driving erratically or had committed a traffic violation there would be a justifiable basis for a stop, under established case law. If the driver was driving lawfully this factor is irrelevant. It is undisputed that Defendant was driving in a lawful manner prior to the stop. The dissent thus lists this factor without applying it.

As to factor (4), it is unclear how the arresting officer's experience is germane to the assessment of the reasonableness of the stop. Because the legitimacy of a stop must be based on objective criteria, it is the circumstances surrounding the stop that must be judged, irrespective of the officer's experience.[15]

The dissent's factor (5) is *"any other circumstance* [ ] that would indicate the motorist was intentionally avoiding [a] roadblock to evade arrest or detection." Dissent at 308, 151 P.3d at 789 (emphasis added). But this factor of "any other circumstance," inculcates the very "kind of standardless and unconstrained discretion ... [that was] the evil the Court ... discerned when ... it ... insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Prouse,* 440 U.S. at 661, 99 S.Ct. 1391.

### 3.

Finally, as to all five factors, the dissent adopts the view that avoiding a roadblock is a sufficient basis for a stop.[16] This is because all the dissent's factors concern conduct resting on Defendant's purported avoidance of a roadblock.

### XI.

This court has upheld DUI automobile stops but only upon a totality of circumstances which support a reasonable suspicion that the driver was intoxicated. *See, e.g., State v. Kaleohano,* 99 Hawai'i 370, 378, 56 P.3d 138, 146 (2002) (ruling that police officer's observation that the "vehicle swerv[ed]

---

create articulable suspicion); *Bass,* 525 S.E.2d at 925 (holding there was no reasonable suspicion to stop a motorist's vehicle where he made a legal U-turn about 500 feet from the roadblock).

**15.** The dissent points to *Steinbeck,* 862 S.W.2d at 913, where it was the officer's testimony that "every road check he has been involved [in,] every vehicle that turns there ... the driver has been drinking alcohol[.]" Dissent at 310, 151 P.3d at 791 (brackets omitted). In that case, there is no indication that although the drivers had been drinking, they were all issued DUI citations or that their driving would give rise to any suspicion that they had been drinking. 862 S.W.2d at 912. Further, Officer Correa's experience, of course, was not the same as the officer

in *Steinbeck;* the court's finding no. 7 indicates that *not* every driver stopped by Officer Correa for turning prior to a checkpoint had been drinking.

**16.** The dissent qualifies its position by characterizing Defendant's acts as "intentionally evading arrest or detection" and, thus, the dissent assumes the very fact in issue. *See e.g.,* dissent at 307–08, 151 P.3d at 788–89. To posit that Defendant was avoiding "arrest" or "detection" presupposes that Defendant was engaged in criminal activity. But the officers did not observe any objective marks of criminal conduct, and what was discovered *after* the stop would not justify the stop.

within its lane of travel and cross[ed] over the solid double center line twice" was "sufficient to warrant an investigative traffic stop to determine whether [the defendant] was driving while impaired"); *Kernan,* 75 Haw. at 39, 856 P.2d at 1226 (holding that the "officer observed specific articulable facts that formed his reasonable belief that the crime of DUI was being committed" where the defendant was speeding and weaving out of his traffic lane and into the oncoming traffic lanes); *Powell,* 61 Haw. at 322, 603 P.2d at 148 (noting that the officer was able to articulate the basis of a stop, namely that the vehicle was "travelling at an abnormally slow rate of speed while repeatedly stopping and signaling prematurely at intersections[,]" and "the automobile hesitated for unusually long periods of time before negotiating turns in spite of a complete absence of vehicular traffic"); *State v. Barrickman,* 95 Hawai'i 270, 277, 21 P.3d 475, 482 (App.2001) (holding that the defendant's conduct in stopping his vehicle for three to five seconds and failing to follow the hand signals of an officer directing traffic, combined with the officer's observation of the defendant's glassy eyes and alcoholic breath, provided reasonable suspicion for an investigative stop).

On the other hand, a seizure and evidence therefrom have been invalidated in the absence of objective facts indicating that criminal activity was afoot. *See, e.g., Eleneki,* 106 Hawai'i at 181, 102 P.3d at 1079 (ruling that police officers lacked reasonable suspicion to stop defendant where the officers had no reasonable basis to infer that person they were seeking would be an occupant of defendant's vehicle because the subject person had been seen boarding said vehicle, defendant had been arrested for a drug-related offense, and officers were informed that defendant was a drug supplier); *Trainor,* 83 Hawai'i at 259, 925 P.2d at 827 (affirming court's ruling that there was no reasonable suspicion to stop the defendant based on a drug courier profile where the characteristics in the profile "described an enormous set of presumably innocent travelers"); *State v. Temple,* 65 Haw. 261, 650 P.2d 1358 (1982) (holding that an anonymous phone call reporting defendant for stolen firearm offense was an insufficient basis to stop the defendant and, there-

fore, the conviction of the defendant and the order denying the motion to suppress were reversed); *State v. Kupihea,* 59 Haw. 386, 387, 581 P.2d 765, 766 (1978) (holding that defendant's crouching motion, without more, was insufficient to justify a stop, and the subsequent seizure of firearms was improper); *State v. Hulihee,* 87 Hawai'i 487, 491, 960 P.2d 157, 161 (App.1998) (holding that the evidence of defendant's DUI was illegally obtained where the officer lacked reasonable suspicion to seize the defendant).

## XII.

Assuming, *arguendo,* any doubt as to the application of the reasonable suspicion standard, this case is resolved by article I, section 7 of the Hawai'i Constitution. Though that section is like the Fourth Amendment, it has been established that "as the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawaii Constitution, [the Hawai'i Supreme Court is] free to give broader privacy protection than that given by the federal constitution." *State v. Kam,* 69 Haw. 483, 491, 748 P.2d 372, 377 (1988) (citations omitted); *see also State v. Lopez,* 78 Hawai'i 433, 445, 896 P.2d 889, 901 (1995) (stating that, "as the ultimate judicial tribunal in the state, this court possesses the final and unreviewable authority to interpret and enforce the Hawai'i Constitution" (citations omitted)).

Significantly, this court has declared that, compared to the Fourth Amendment, article I, section 7 of the Hawai'i Constitution guarantees persons in Hawai'i a "more extensive right of privacy[.]" *State v. Navas,* 81 Hawai'i 113, 123, 913 P.2d 39, 49 (1996); *see also State v. Dixon,* 83 Hawai'i 13, 23, 924 P.2d 181, 191 (1996) (noting that "article I, section 7 of the Hawai'i Constitution provides broader protection than the [F]ourth [A]mendment to the United States Constitution because it also protects against unreasonable invasions of privacy"); *State v. Tanaka,* 67 Haw. 658, 661–62, 701 P.2d 1274, 1276 (1985) ("In our view, article I, § 7 of the Hawai'i Constitution recognizes an expectation of privacy beyond the parallel provisions in the Federal Bill of Rights.").

■ Hence, it would be violative of the "extensive right to privacy" guaranteed by the Hawai'i Constitution for this court to permit seizures to occur on the basis of a suspicion that a motorist was avoiding a police confrontation by making a lawful turn. Unlike the exclusionary rule on the federal level, Hawaii's exclusionary rule serves not only to deter illegal police conduct, but to protect the privacy rights of our people. *See Lopez*, 78 Hawai'i at 446, 896 P.2d at 902.

## XIII.

■ The logical corollary to the dissent's rule, which penalizes a motorist for not going through a roadblock, is that motorists may be *coerced* lawfully into passing through one—a proposition inimical to our constitution's protection of the right of privacy—to be free of individual suspicionless, and thus, unreasonable seizures. *See also State v. Endo*, 83 Hawai'i 87, 93, 924 P.2d 581, 587 (1996) (holding that article I, section 7 of the Hawai'i Constitution *"requires that governmental intrusion into the personal privacy of citizens of this State be no greater in intensity than absolutely necessary"* (citations omitted) (emphasis in original)). The dissent relies on citations to jurisdictions that have held that avoidance of an intoxication checkpoint is an articulable basis upon which to conduct a stop.[17] However, not a single one of these cases relies on constitutional provisions that afford greater protection by

way of an express right of privacy, as does Hawaii's constitution.[18]

The violative nature of the procedure followed by the police becomes apparent in the consequences resulting from these stops as evidenced by finding no. 7. As mentioned before, in finding no. 7 the court found that in Officer Correa's forty stops, "the individual avoiding the checkpoint was either intoxicated *or* was violating the law *in some other way* such as[ ] not having a vehicle insurance or [a] driver[']s license or having an outstanding warrant." (Emphases added.) In cases where there was a violation "in some other way," such violation would only become apparent *after* the stop, confirming that in such instances the stops were made without reasonable suspicion or probable cause of criminal activity, absent inculpatory pre-stop facts. Further, based on finding 7, it is evident that in such "other" cases, the drivers were not operating their vehicles under the influence of an intoxicant. Yet they were subjected to a stop that was not warranted under the constitution and under HRS §§ 291E–19 and –20. *See infra.* In effect, the police in this case set up an unauthorized checkpoint at which suspicionless stops were made in advance of the statutory roadblocks—a patent disregard of HRS 291E–20 (*see* the court's conclusion no. 9) and the heightened right of privacy protected by the Hawai'i Constitution.[19]

---

17. *See* Dissent at 308–11, 151 P.3d at 789–92 (citing *Lester*, 148 F.Supp.2d 597; *Snyder*, 538 N.E.2d 961; *Steinbeck*, 862 S.W.2d 912; *Oughton*, 916 S.W.2d 462; *Foreman*, 527 S.E.2d 921; *Thill*, 474 N.W.2d 86; *Binion*, 900 S.W.2d 702; *Stroud*, 370 S.E.2d 721; *Commonwealth v. Eaves*, 13 Va.App. 162, 408 S.E.2d 925 (1991); *Murphy*, 384 S.E.2d 125).

18. The dissent quotes *Foreman*, 527 S.E.2d at 924–25, in support of its proposition that "the effectiveness of intoxication checkpoints would be reduced if motorists are permitted to avoid them," dissent at 311–12, 151 P.3d at 795, which states, in relevant part, "it is clear that the perimeters of the checkpoint or the area in which checks are conducted would include the area within which drivers may become aware of its presence by observation of any sign marking or giving notice of the checkpoint[,]" 527 S.E.2d at 924.

The question of whether a standard based on when "drivers will become aware of a road-

block's presence" gives rise to unconstrained discretion aside, *Hester* would run afoul of our State constitutional protection against unreasonable seizures; the requirement that a vehicle stop be premised on reasonable suspicion indicates such a stop is not a "minimal intrusion" as the dissent contends. Dissent at 311–12, 151 P.3d at 795–96. In any event, as *Prouse* and *Sitz* indicate, the "minimal intrusion" "in combating intoxicated motorists," *id.*, is accounted for by allowing nondiscretionary enforcement at roadblocks even though no suspicion of criminal activity exists as to the drivers stopped.

19. In support of its "minimal intrusion" argument, the dissent cites to three cases, dissent at 311–12, 151 P.3d at 795–96, none of which are germane, but are clearly inapposite. *State v. Ferreira*, 133 Idaho 474, 988 P.2d 700 (Ct.App. 1999), is supportive of the position herein. In that case, the Idaho Court of Appeals concluded that "the administration of field sobriety tests following a traffic stop is but an investigative

## XIV.

As noted previously, the stop also violated HRS §§ 291E–19 and –20. Those statutes do not authorize, as part of a roadblock procedure, a stop of a vehicle operated lawfully that turns in advance of the actual checkpoint. The *Prouse* Court noted that its holding, implicitly approving roadblocks, did "not preclude the State of Delaware or other States from developing methods for spot checks that involve *less* intrusion or that do not involve the unconstrained exercise of discretion" and that "[q]uestioning of *all* oncoming traffic at roadblock-type stops is one possible alternative." 440 U.S. at 663, 99 S.Ct. 1391 (emphases added).[20]

In *Sitz*, the Court ruled that sobriety checkpoints established at pre-determined sites wherein all vehicles were stopped and the drivers examined for signs of intoxication

for a brief period were reasonable. 496 U.S. at 454, 110 S.Ct. 2481. This exception to the rule that a stop be based on reasonable suspicion is justified on the premise that systematic and non-discriminatory seizures *minimally* intrude upon an individual's privacy. *See Davis v. Kansas Dep't of Revenue* 252 Kan. 224, 843 P.2d 260, 262 (1992) (observing that *Sitz* distinguishes *Terry* stops from "systematic roadside checkpoint stop[s]" and that under *Sitz*, Michigan's interest in preventing drunk driving outweighed the degree of intrusion on an individual motorist's privacy); *Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035, 1043 (1987) (holding that the objective intrusion of a roadblock, measured by the duration of the seizure and intensity of the duration of the stop, and the subjective intrusion of such roadblock, described in *Sitz* as "the potential

detention," *id.* at 706, and affirmed the reasonable suspicion standard, stating, "Such an investigative stop must be justified by some objective manifestation that the person stopped is, or is about to be, *engaged in criminal activity* [,]" *id.* at 705 (citations omitted) (emphasis added). That court noted that "field sobriety tests are reasonable methods of conducting an investigation, based on *specific and articulable facts that a driver is operating his or her vehicle contrary to [Idaho's DUI statute]." Id.* (emphasis added). Therefore, *Ferreira* comports with our holding that the purported investigatory stop by the police violated article I, section 7 of the Hawai'i Constitution inasmuch as it was not supported by a reasonable and articulable suspicion that Defendant was engaged in criminal conduct.

*State v. Johnson*, 130 N.M. 6, 15 P.3d 1233 (2000), did not involve the reasonableness of an investigatory stop on a public street and, therefore, is irrelevant. In *Johnson*, the Supreme Court of New Mexico considered "whether the Legislature intended to place a geographical limitation on the offense of DWI depending on the *type of activity constituting the 'driving' of a* vehicle." *Id.* at 1235. The court held that "the State may charge a person who is in actual physical control of a *non-moving vehicle with DWI despite the fact that he or she is on private property." Id.* at 1234 (emphasis added).

*McCloskey v. Honolulu Police Dep't*, 71 Haw. 568, 799 P.2d 953 (1990), upon balancing the interests involved, upheld the constitutionality of the Honolulu Police Department's (HPD) drug testing program and is wholly distinguishable from this case involving an alcohol checkpoint. For one, the interests at play were very different as this court noted, "HPD's program serves to protect both public and police safety and to preserve HPD's integrity and ability to perform its police function." *Id.* at 579, 799 P.2d at 959.

Further, as noted, "a police officer, by reason of the employment as a police officer, has a diminished expectation of privacy." *Id.*

**20.** The dissent's contention that roadblock procedures are not germane and that it declines to address such procedures is first belied by the court's own findings 11, 29, and 30, and conclusions 9, 10, and 11, *see supra*, and second, by the dissent's citations to cases which have analyzed the reasonableness of the stop in conjunction with the relevant roadblock procedure. *See e.g., Steinbeck*, 862 S.W.2d at 913 (stating that "a state's use of sobriety checkpoints does not violate the Fourth and Fourteenth Amendments to the United States Constitution when the state is conducting such checkpoints *pursuant to a systematic plan*" (citing *Michigan State Police v Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (emphasis added))); *Binion*, 900 S.W.2d at 705 (recognizing that "[a] precondition to the constitutional acceptability of a seizure made as a result of a roadblock is 'that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individualized officers[,]' " and that "[i]n accordance with these constitutional limitations, the Tennessee Highway Patrol has formulated a set of rules for roadblocks designed to check for unlicensed drivers" (internal citation omitted)).

Therefore, the dissent implicitly concedes that stops in aid of roadblocks do implicate roadblock procedures such as those in HRS §§ 291E–19 and –20. The deterrent value of roadblocks and stops the dissent advocates for, dissent at 311-12, 151 P.3d at 795–96, is not for us to decide; our focus must be on whether the roadblock procedure was legal.

to generate fear and surprise in motorists," can be "reduced to a constitutionally acceptable degree by the manner in which it is managed and conducted").

## A.

In Hawai'i, the legislature has addressed the need to reduce the intrusiveness of a roadblock by prescribing under HRS chapter 291E, certain procedures in effecting roadblocks. HRS § 291E–19 mandates that "[t]he chief of police in any county establishing an intoxicant control roadblock ... specify the procedures to be followed [in the creation of such roadblock] ... *provided that the procedures shall be in conformity with and not more intrusive than the standards and guidelines described in [HRS § ]291E–20.*" (Emphasis added.) HRS § 291E–20 contains the "[m]inimum standards for roadblock procedures," in the following manner:

(a) Every intoxicant control roadblock program shall:

(1) *Require that all vehicles approaching roadblocks be stopped or that certain vehicles be stopped by selecting vehicles in a specified numerical sequence or pattern;*

(2) Require that roadblocks be located at fixed locations for a maximum three-hour period;

(3) Provide for the following minimum safety precautions at every roadblock:

(A) Proper illumination;

(B) Off-road or otherwise safe and secure holding areas for vehicles involved in any roadblock stop;

(C) Uniformed law enforcement officers carrying proper identification; .

(D) Adequate advance warning of the fact and purpose of the roadblocks, either by sign posts, flares, or other alternative methods;

(E) Termination of roadblocks at the discretion of the law enforcement officer in charge where traffic congestion would otherwise result; and

(4) Provide for a sufficient quantity and visibility of uniformed officers and official vehicles to ensure speedy compliance with the purpose of the roadblocks and to move traffic with a minimum of inconvenience.

(b) Nothing in this section shall prohibit the establishment of procedures to make roadblock programs *less intrusive than required by the minimum standards* provided in this section.

(Emphases added.) Hence, under HRS § 291E–20, any other procedure established by law enforcement officials in effectuating a roadblock must be "less intrusive than required by the minimum standard."

## B.

▮ It is undisputed that Defendant was stopped in relation to a perceived evasion of a roadblock. Officer Correa was responsible for watching southbound vehicles that (1) "pull off the road and shut down [their] lights on the shoulder to avoid detection," (2) "whip[ ] a U-turn before getting to the ... checkpoint[,]" and (3) "turn[ ] off onto Mehameha Loop or another side [road]" "just north" of the checkpoint. HRS § 291E–20 does not authorize law enforcement officers conducting sobriety checkpoints to pursue and detain drivers of motor vehicles appearing to avoid the sobriety checkpoints in a lawful manner. Permitting officers to do so is beyond the express scope of the statutory procedures and, therefore, "more intrusive than the standards and guidelines described in [HRS § ]291E–20" and violative of HRS § 291E–19.

Thus HRS §§ 291E–19 and –20 are directly related and germane to the reasonableness of the sobriety checkpoint procedures in this case. *State v. Fedak*, 9 Haw.App. 98, 101–02, 825 P.2d 1068, 1071 (1992), *superseded by statute* as stated in *State v. Claunch*, 111 Hawai'i 59, 64, 137 P.3d 373, 378 (App.2006), established that the reasonableness of a seizure and the guidelines provided in the HRS are interrelated:

Adherence to these guidelines ... assures that a roadblock seizure is the result of a plan embodying explicit, neutral limitations on the conduct of individual officers. *Conducting roadblocks in accordance with such neutral criteria minimizes the risk that the individual's reasonable expecta-*

*tion of privacy will be subject to the discretion of the official in the field.* Adherence to the guidelines' requirements also assures that the surprise, fear, and inconvenience to—and therefore the intrusion on—the—motoring public is minimized.

(Emphasis added.) (Internal citations, quotation marks, and brackets omitted.)

*Fedak* considered the guidelines under HRS § 286–162.6 (1985 & Supp.1991). In enacting HRS § 286–162.6, the Committee on Judiciary explained that constitutional restrictions against intrusion into an individual's privacy rights were recognized as "well founded and proper" in authorizing roadblocks:

> (4) In analysis of legislation of this type, concern over constitutional implications is well-founded and proper. *Cognizant of fundamental Fourth Amendment protection against unreasonable searches and seizures, legislation authorizing the establishment of intoxication control roadblocks must provide minimum standards which limit officer discretion and the level of intrusion on individual rights.*
>
> . . . .
>
> (6) The minimum standards for intoxication control roadblock standards should generally be provided for by statute, with specific procedures to be established by rules and regulations adopted pursuant to [HRS] [c]hapter 91.

Hse. Stand. Comm. Rep. No. 418–84, in 1984 House Journal, at 1033 (emphasis added). As observed in *Claunch*, 111 Hawai'i at 64 n. 4, 137 P.3d at 378 n. 4, HRS § 286–162.6 was subsequently re-enacted as HRS § 291E–20 by Act 189, § 23 of the 2000 Hawai'i Legislature. HRS § 291E–20 embodies identical language to HRS § 286–162.6 with respect to roadblock guidelines.

### XV.

Consistent with HRS chapter 291E, the Guide, promulgated by the NHTSA in November 1990 with the help of numerous law enforcement officers and agencies from various states, supports the view that a lawful turn, in apparent avoidance of a sobriety checkpoint, is not a valid basis for a stop.[21] The Guide at 1. In general, the Guide was designed "to provide law enforcement agencies with a uniform method to plan, operate, and evaluate sobriety checkpoints[,]" *id.*, by setting forth

> operational procedures that police administrators may want to consider in order to ensure that sobriety checkpoints are used legally, effectively and safely. These points are consistent with those specified in recent court decisions, including the United States Supreme Court ruling in . . . *Sitz*, upholding the constitutionality of sobriety checkpoints.

*Id.* at 2.

When a driver chooses to avoid a sobriety checkpoint, the Guide specifically states that

> [a] motorist who wishes to avoid the checkpoint by legally turning before entering the checkpoint area should be allowed to do so unless a traffic violation(s) is observed or probable cause exists to take other action. *The act of avoiding a sobriety checkpoint does not constitute grounds for a stop.*

*Id.* at 7 (emphasis added). Other jurisdictions have observed that, pursuant to similar guidelines, a motorist should not be penalized for avoiding a sobriety checkpoint. *See Little*, 479 A.2d at 906 (noting that pursuant to Maryland's policy regarding intoxication checkpoints, "[a] motorist wishing to avoid a sobriety checkpoint may make a U-turn or turn onto a side road prior to reaching the roadblock[ ]" and that "[n]o action is taken against a driver doing so unless the motorist drives erratically"); *McCleery*, 560 N.W.2d

---

21. In the Guide, the NHTSA acknowledged the contributions of individuals from the
> Dayton Police Department, Dayton, Ohio; . . . Franklin County Sheriff's Department, Columbus, Ohio; . . . Indiana State Police; Maryland State Police; . . . Metropolitan Police Department, Washington, D.C.; . . . Michigan State Police; . . . New York State Police; . . . Palm Beach County Sheriff's Department, West Palm Beach, Florida; . . . Redding Police Department, Redding, California[;] the International Association of Chiefs of Police (IACP) and the National Sheriffs' Association.

at 793 (concluding that the police officers did not have a reasonable suspicion to stop the defendant's car solely because she appeared to be evading an intoxication checkpoint in light of Nebraska's adherence to the Guide).

### XVI.

■ The argument that Defendant failed to raise on appeal HRS §§ 291E–19 and –20, and the exclusion of the Guide into evidence, is misplaced. Any exposition of the case law in our jurisdiction and from other jurisdictions would be incomplete and misleading without a contextual reference to the roadblock statutes and the Guide, which have their genesis in the constitutional text prohibiting unreasonable seizures.[22] *See Sitz,* 496 U.S. at 452, 110 S.Ct. 2481 (emphasizing that "guidelines governing checkpoint operation minimize discretion of the officers on the scene"); *Binion,* 900 S.W.2d at 705 n. 2 (noting that "guidelines governing the roadblocks held constitutionally firm in *Sitz* and [*State v.] Manuel* [, no. 87–96–III, 1988 WL 123988, at *2 (Tenn.Crim.App. Nov.23, 1988),[23]] had provisions prohibiting officers from apprehending motorists who made safe u-turns or turn-offs to avoid the roadblock"); Stand. Comm. Rep. No. 418–84, in 1984 House Journal, at 1033 (noting that statutory

roadblock procedures should provide "minimum standards which limit officer discretion and the level of intrusion on individual rights").

### A.

It would be disingenuous in this case to perform an analysis of the reasonableness of the stop disengaged from consideration of HRS §§ 291E–19 and –20. Defendant's stop arose because of the roadblock, and that roadblock was subject to the directives of HRS § 291E–20. Hence, the court's undisputed conclusion no. 9 states that "[t]he Legislature had public safety concerns in mind when [it] enacted H.R.S. § 291E–20 allowing police to conduct intoxication checkpoints." The court's undisputed finding no. 8 states that "the intoxication checkpoint was in place to stop vehicle[ ]s traveling southbound on Mokulele Highway in a numerical pattern to check for signs of intoxication." Relatedly, the court determined in undisputed finding no. 9, that "Officer Correa was stationed *just north of the intoxication checkpoint and was tasked with observing traffic and making stops based upon probable cause[.]* " (Emphasis added.) The stop, then, was clearly made in connection with the roadblock, and in aid of that roadblock.[24]

---

22. Hence, we do not concur with the dissent's contention that Defendant "does not challenge ... the propriety of the police establishing roadblocks [under the relevant statutes]." Dissent at 313, 151 P.3d at 794; *see infra* note 24. Further, we must respectfully disagree that we are " 'scour[ing] the universe' " and "becoming advocates for the appellants," as the dissent charges. Dissent at 314 n. 4, 151 P.3d at 795 n. 4. It would be ill-advised to ignore the role of roadblocks, such as that proscribed in HRS §§ 291E–19 and –20 and the guidelines in the evolution of the case law involving DUI stops. In order to render an informed decision, we must, as have other jurisdictions, examine the roadblock statutes and guidelines for stops. Moreover, as noted *supra,* although not "officially" part of the roadblock, the salient facts demonstrate that the stop in this case was part of the roadblock procedure. *See* court's findings 1, 5, 17, 26–30. In that respect, the dissent's position is wrong.

23. *Manuel* was an unpublished disposition by the Tennessee Court of Criminal Appeals upholding the constitutionality of a sobriety roadblock in light of the governmental interest served by a roadblock and the minimal intrusion upon mo-

torists' privacy rights as evaluated under guidelines designed by the Tennessee Highway Patrol.

24. Contrary to the dissent's objection that Defendant "does not challenge *per se* the propriety of the police establishing roadblocks under HRS §§ 291E–19 and –20," dissent at 313, 151 P.3d at 794, Defendant, on appeal, has arguably challenged the propriety of the police establishing roadblocks under HRS §§ 291E–19 and –20. Defendant submits in his "Points of Error" that "[t]he trial court erred in denying [Defendant's] Motion to Suppress Evidence[,]" and incorporates by reference the trial court's ruling. This ruling, which appears in the trial transcript, is confirmed in the court's "Findings of Fact, Conclusions of Law and Order Denying Defendant's Motion to Suppress Evidence." Indeed, as part of its decision the court acknowledged the case's connection to HRS § 291E–20:

The Supreme Court it's my understanding has reviewed *291E–20, and has found that roadblocks are permissible if you—if the statutory scheme is strictly followed.* That that [sic] would be—because the Legislature has found that there is a danger to the public of intoxicated drivers that a—a—a limited infraction on

Consequently, it is indisputable that the stop in this case would not have occurred but for the existence of the checkpoint, and that Correa's surveillance and stop augmented the checkpoint. Such checkpoints are permitted only by virtue of *Prouse's* allowance of a limited intrusion as implemented under HRS §§ 291E–19 and –20. *Sitz* also emphasized the importance of "guidelines governing checkpoint operation [which] minimize discretion of the officers on the scene." 496 U.S. at 452, 110 S.Ct. 2481. Given the holdings of *Prouse* and *Sitz,* and the express "concern over constitutional implications" of the legislature in enacting HRS chapter 291E, *see supra,* it is illogical to sever any analysis of the procedure employed by the police from HRS §§ 291E–19 and –20 *irrespective of whether Defendant raised the*

statutes or guidelines on appeal or not Such discussions are part and parcel of the case law that cogently decides these issues.[25]

## B.

■ The record indicates that the court, in determining the relevancy of the Guide, instructed Defendant's counsel that "*you may submit it as argument,* it's not the law." (Emphasis added.) Hence, although ultimately excluded, the Guide *was considered in* the case. Also, consideration of the Guide on appeal, like HRS §§ 291E–19 and –20, is germane to the reasonableness of the stop in this case by virtue of the principles in *Prouse* and *Sitz.* Like HRS § 291E–20, the Guide incorporates procedures designed to minimize the intrusion on a motorist's privacy when conducting a sobriety checkpoint.[26] In-

---

the Constitutional rights of all citizens is permitted if a strict procedure is followed. *That procedure is set forth in 291E–20.* (Emphases added.)

25. Contrary to the dissent's position, it is of no consequence that only the reasonable suspicion aspect of the investigatory stop was challenged at the *suppression hearing.* Dissent at 313, 151 P.3d at 794. For following the court's ruling denying Defendant's motion to suppress, the court clarified its ruling, stating that if the roadblock was in compliance with HRS § 291E–20, then Defendant would not be able to avoid passing through it. The court subsequently entered conclusion no. 9 and finding nos. 8 and 9, specifically with respect to the roadblock. *See supra.* As discussed *supra,* the roadblock procedure implicitly approved by the court exceeded the authority granted to the police under HRS §§ 291E–19 and –20.

The dissent also cites to *Binion,* 900 S.W.2d 702, and *Murphy,* 384 S.E.2d at 129 n. 3, to conclude that it may "decline to consider any theories not advanced by [Defendant,]" such as "the propriety of the police establishing roadblocks under HRS § [§ ] 291E–19 and [–]20." Dissent at 313, 151 P.3d at 794. Aside for the reasons previously discussed as to why consideration of such matters is inescapable, *Binion* and *Murphy* are contrary to the dissent's position.

In *Binion,* the court held "that the action of a motorist, under the circumstances of this case, in making a lawful turn 1,000 feet before a roadblock does not give rise to a reasonable suspicion of criminal activity unless the driver's turn or action is coupled with other articulable facts." 900 S.W.2d at 706. Because the stop of the motorist was not based on reasonable suspicion, the judgment of the trial court was reversed, and the charges were dismissed. *Id.* Similarly, in

*Murphy,* the court held that "a driver's action in making a legal turn within sight of a roadblock. does not give a police officer a reasonable basis to suspect that the driver is involved in criminal wrongdoing." 384 S.E.2d at 126. Because the officer lacked reasonable suspicion to stop the defendant, the "fruit of the illegal stop" was suppressed, and the defendant's conviction was reversed. *Id.*

Accordingly, it was unnecessary for both the *Binion* court and the *Murphy* court to reach the propriety of the roadblock procedure inasmuch as the officer's lack of reasonable suspicion was dispositive of the defendant's claim. Here, that Officer Correa lacked reasonable suspicion to stop Defendant would be dispositive as well.

26. Of course, pursuant to Hawai'i Rules of Evidence (HRE) Rule 201, an appellate court may take judicial notice of acts of an executive agency. *See, e.g., Armbruster v. Nip,* 5 Haw.App. 37, 43, 677 P.2d 477, 482 (1984) (taking judicial notice of a letter from the acting regional director of the National Labor Relations Board, made part of the record in a related proceeding, expressing his opinion that a party, the East-West Center is not an "employer" within the meaning of the Hawaii Employment Relations Act). Also, this court may consider plain error for the apparent failure of Defendant to raise HRS § 291E–20 and the Guide on appeal. *See State v. Nichols,* 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006) (stating that "[i]f the substantial rights of the defendant have been affected adversely, the error will be deemed plain error" (citation omitted)). Appellate courts, in criminal cases, may *sua sponte* "notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings[,]" *State v. Fox,* 70 Haw. 46, 56, 760 P.2d 670, 675–76 (1988), as in this case.

deed, with respect to motorists who make safe turns in order to avoid roadblocks, it has been indicated in the case law itself that a provision prohibiting seizure of motorists making "turn offs" may have been a consideration in upholding the roadblock in *Sitz.*

> We must note that the guidelines governing the roadblocks held constitutionally firm in Sitz and Manuel had provisions prohibiting officers from apprehending motorists who made safe u-turns or turn-offs to avoid the roadblock. No such condition is in Department of Safety General Order 410, and it may be that the lack of such a condition renders any roadblock conducted pursuant to the Order unconstitutional. We find it unnecessary to address the issue in this opinion.

*Binion,* 900 S.W.2d at .705 n. 2 (emphases added). The Guide expressly designed procedures that were "consistent with those specified in recent court decisions, including the [Court's] ruling in [*Sitz* ]." The Guide at 1. *See also Binion,* 900 S.W.2d at 705 (noting that a seizure "must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individualized officers" (internal quotations marks and citation omitted)). Again, because the Guide is imbedded in the legal doctrine concerning roadblocks, it would be untenable to ignore the Guide in any informed discourse, irrespective of any arguable failure on the part of Defendant to raise it on appeal.

## XVII.

The stop in this case violated the precepts under article I, section 7 of the Hawai'i Constitution and the statutory guidelines of HRS chapter 291E. For the reasons stated, the court's June 7, 2005 order denying Defendant's motion to suppress is vacated and the case is remanded to the court with instructions to enter an order granting Defendant's motion to suppress and to allow Defendant to withdraw his plea pursuant to HRPP Rule

11(a)(2). *See Kealaiki,* 95 Hawai'i at 314 & n. 6, 22 P.3d at 593 & n. 6.

Concurring Opinion by LEVINSON, J., in which NAKAYAMA, J., Joins.

Considering the totality of the circumstances reflected in the record on appeal—including the time of day, the proximity of the defendant-appellant Raymond J. Heapy's vehicle to the Mokulele Highway intoxication checkpoint, the characteristics of Mehameha Loop, and Officer Correa's prior "experience"—, I believe that Officer Correa could reasonably have suspected no more than that Heapy was intentionally attempting to avoid the checkpoint when Officer Correa seized Heapy for constitutional purposes via the use of his "chase car" after observing Heapy's vehicle lawfully execute a right-hand turn onto Mehameha Loop. In my view, the search-and-seizure jurisprudence of this state, grounded in the Hawai'i Constitution, stands squarely for the proposition that the foregoing was insufficient as a matter of law to give rise to reasonable suspicion (much less probable cause) on Officer Correa's part to believe that criminal activity was afoot. That being the case, Officer Correa's seizure of Heapy contravened the protections afforded by article I, section 7 of the Hawai'i Constitution.

Because I would vacate the district court's March 18, 2005 judgment and remand with instructions to grant Heapy's motion to suppress, I concur in the judgment announced by the plurality opinion.

Dissenting Opinion by MOON, C.J.

I disagree with the plurality's conclusion that the District Court of the Second Circuit erred in determining that the arresting police officer had reasonable suspicion to effect an investigatory stop based on the police officer's belief that defendant-appellant Raymond J. Heapy was intentionally avoiding an

Assuming, *arguendo,* that an "exception" must be "taken" with respect to HRS §§ 291E–19 and –20 and the court's exclusion of the Guide, notice of plain error would be appropriate. As earlier explained, the procedures listed in HRS § 291E–20 and the Guide are relevant to a discussion of the reasonableness of the stop. These prescribed procedures were developed in order to minimize intrusion upon an individual's privacy rights and are referred to in much of the case law. Given the negative constitutional implications of the court's decision, application of the plain error doctrine would be proper.

intoxication checkpoint to evade arrest or detection. The plurality's conclusion essentially creates a bright-line rule that, (1) notwithstanding the reasonable inferences drawn from a totality of circumstances, coupled with their training and experience, police officers may *never* stop vehicles that are believed to be intentionally avoiding a checkpoint because of some involvement in criminal activity and (2) effectively abrogates our state's compelling interests in protecting the safety of the public and combating intoxicated motorists. Moreover, inasmuch as Heapy does not challenge *per se* the propriety of the police establishing roadblocks under Hawai'i Revised Statutes (HRS) §§ 291E–19 and –20, I would decline to reach the plurality's conclusion that "the 'chase car' police procedure of stopping all vehicles that lawfully turn onto a public way in advance of a checkpoint exceeded that statutorily authorized." Plurality at 285, 151 P.3d at 766. I, therefore, respectfully dissent.

Preliminarily, I note that Heapy's *sole* contention on appeal centers on whether the district court erred in denying his motion to suppress evidence (motion to suppress) by determining that Officer Ericlee Correa had reasonable suspicion to effect an investigatory stop based on his belief that Heapy was intentionally avoiding the intoxication checkpoint to evade arrest or detection. Plaintiff-appellee State of Hawai'i (the prosecution) contends that the district court did not err in denying Heapy's motion to suppress inasmuch as "Officer Correa's investigative stop of Heapy was lawful." Specifically, the prosecution asserts that:

Heapy's turn down Mehameha Loop after passing two large signs which read "INTOXICATION CHECKPOINT AHEAD" initially raised Officer Correa's suspicions. *While stationed at his post for nearly two hours, Officer Correa did not see any other vehicle[ ] other than Heapy's turn down Mehameha Loop.* In fact, as Officer Correa testified, *Mehameha Loop was blocked off by a metal gate and was not open to through traffic; and the public was not allowed to travel on the adjacent canefield roads.* Other than the animal shelter, *there was nothing else on Mehameha Loop except canefields.* Moreover, although Officer Correa followed Heapy down Mehameha Loop, Officer Correa did not activate his blue lights until after Heapy passed the entrance to the closed animal shelter. Thus, it was even more obvious that Heapy was not going to the closed animal shelter, but instead, as Officer Correa reasonably suspected, was actually attempting to avoid being stopped at the intoxication checkpoint.

Thus, all of these facts known to Officer Correa, considered in conjunction with the reasonable inferences arising from the totality of the circumstances, including Officer Correa's training and experience, would warrant a man of reasonable caution in believing that Heapy avoided the intoxication checkpoint due to some type of involvement in criminal activity, *i.e.*, driving under the influence.

(Emphases added.) I agree.

Both article I, section 7 of the Hawai'i Constitution [1] and the fourth amendment to the United States Constitution [2] protect the right of people to be secure in their persons and the right to be free from unreasonable searches and seizures, and article I, section 7 "additionally protects specifically against unreasonable invasions of privacy." *State v. Dixon*, 83 Hawai'i 13, 21–22, 924 P.2d 181, 189–90 (1996). "The United States Supreme Court has held that[,] when a police officer

---

**1.** Article I, section 7 of the Hawai'i Constitution provides in relevant part:

The right of the people to be secure in their persons ... against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

**2.** The fourth amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

stops an automobile and detains its occupants, a 'seizure' occurs so as to implicate the fourth and fourteenth amendments to the United States Constitution." *State v. Prendergast*, 103 Hawai'i 451, 453–54, 83 P.3d 714, 716–17 (2004) (citing *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *State v. Bolosan*, 78 Hawai'i 86, 92, 890 P.2d 673, 679 (1995)) (footnote omitted). This court "presume[s] that a warrantless search or seizure is invalid unless and until the prosecution proves that the search or seizure falls within a well-recognized and narrowly defined exception to the warrant requirement." *Id.* at 454, 83 P.3d at 717. One such "well-recognized and narrowly defined exception" is that "a police officer may stop an automobile and detain its occupants if that officer has a 'reasonable suspicion' that the person stopped was engaged in criminal conduct." *Id.* (citation omitted); *see State v. Eleneki*, 106 Hawai'i 177, 180, 102 P.3d 1075, 1078 (2004) (same). In other words, "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *State v. Barnes*, 58 Haw. 333, 337, 568 P.2d 1207, 1211 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (internal quotation marks omitted).

To justify an investigative stop, short of an arrest based on probable cause, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The ultimate test in these situations must be whether from these facts, measured by an objective standard, a man of reasonable caution would be warranted in believing that criminal activity was afoot and that the action taken was appropriate. *Id.* at 338, 568 P.2d at 1211 (internal quotation marks and citations omitted). "To determine whether the officer indeed had specific and articulable facts to justify the investigative stop, [this court] examine[s] *the totality of the circumstances* measured by an objective standard." *Prendergast*, 103 Hawai'i at 454, 83 P.3d at 717 (citing *United States v. Arvizu*, 534 U.S. 266, 273,

122 S.Ct. 744, 151 L.Ed.2d 740 (2002)) (emphasis added). "*This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.*" *Arvizu*, 534 U.S. at 273, 122 S.Ct. 744 (internal quotation marks and citation omitted) (emphasis added); *see State v. Binion*, 900 S.W.2d 702, 705 (Tenn.Crim.App.1994) ("In determining whether a police officer's reasonable suspicion is supported by specific and articulable facts, a court must consider the totality of the circumstances. This includes, but is not limited to, objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him." (Format altered.) (Citation omitted.)); *Murphy v. Commonwealth*, 9 Va.App. 139, 384 S.E.2d 125, 128 (1989) ("Courts must apply objective standards in determining whether the requisite degree of suspicion exists, taking into account that trained law enforcement officers may be able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." (Internal quotation marks and citation omitted.)).

Until today, this court had yet to address whether avoidance of an intoxication checkpoint or roadblock by making a lawful turn or U-turn to evade arrest or detection creates reasonable suspicion to effect an investigatory stop on a vehicle. Contrary to the plurality's position that "the majority of other jurisdictions have held, based on the facts presented, that it is not permissible to pursue and detain drivers of motor vehicles appearing to legally avoid sobriety checkpoints," plurality at 293, 151 P.3d at 774, other jurisdictions have made the observation that the case law is "split on whether avoiding a roadblock or checkpoint alone creates sufficient reason for a traffic stop." *Oughton v. Dir. of Revenue*, 916 S.W.2d 462, 464 n. 2 (Mo.Ct.App.1996) (noting that "[t]he majority

position appears to be that such avoidance can provide the *sole* basis for such a stop") (citations omitted) (emphasis in original); *but see People v. Rocket*, 156 Misc.2d 641, 594 N.Y.S.2d 568, 570 (N.Y. Justice Ct.1992) (stating that "it appears that the prevailing view . . . is that the mere making of a U-turn or a turnoff to avoid a[n intoxication] checkpoint is not, in and of itself, [a] sufficient basis for a stop") (citations omitted). Notwithstanding the seemingly contradictory case law, it appears that the majority of jurisdictions utilize or implicitly consider several factors in determining whether an officer had specific and articulable facts to justify an investigatory stop when a motorist executes a lawful turn or U-turn in an apparent attempt to avoid a roadblock to evade arrest or detection. These factors include: (1) the motorist's distance from the roadblock when the turn or U-turn was made; (2) whether the motorist was able to see the roadblock before he or she took evasive action; (3) the manner in which the motorist operated his or her vehicle in making the evasive action; (4) the arresting officer's experience; and (5) any other circumstances that would indicate the motorist was intentionally avoiding the roadblock to evade arrest or detection. *State v. Binion*, 900 S.W.2d 702, 706 (Tenn.Crim.App.1994) (footnote omitted); *see State v. Foreman*, 351 N.C. 627, 527 S.E.2d 921, 923 (2000) (stating that, "[a]lthough a legal turn, by itself, is not sufficient to establish a reasonable, articulable suspicion, *a legal turn in conjunction with other circumstances, **such as the time, place and manner in which it is made,** may constitute a reasonable, articulable suspicion which could justify an investigatory stop*") (some emphases added and some omitted); *Pooler v. Motor Vehicles Div.*, 88 Or.App. 475, 746 P.2d 716, 718 (1987) (essentially holding that a legal U-turn before a roadblock does not *by itself* constitute reasonable suspicion); *Commonwealth v. Metz*, 412 Pa.Super. 100, 602 A.2d 1328, 1335 (1992) (holding that a motorist's avoidance or attempt to avoid a roadblock must be coupled with other articulable facts in order to give officer reasonable suspicion that motorist is in violation of the law or that criminal activity is afoot); *Murphy*, 384 S.E.2d at 129

(stating that "[f]actors as subtle as the difference between a U-turn 150 feet from a road block and a lawful turn into an existing roadway 350 feet from a roadblock may affect the determination" whether reasonable suspicion exists to justify an investigatory stop).

As to the first factor, relating to the distance from the roadblock, "the rule seems to be the farther away a motorist is from the roadblock, the less objectively reasonable it is to infer that the turn was made out of a consciousness of guilt." *United States v. Lester*, 148 F.Supp.2d 597, 603 (D.Md.2001). *See, e.g., Howard v. Voshell*, 621 A.2d 804, 805 (Del.Super.Ct.1992) (holding that there was no reasonable suspicion to stop driver's vehicle simply because she made a lawful U-turn 1,000 feet before a checkpoint); *State v. Powell*, 591 A.2d 1306, 1308 (Me.1991) (stating that the court below was not compelled to find that the officer had a reasonable suspicion of criminal activity where motorist turned around as much as 2,100 feet before roadblock); *Binion*, 900 S.W.2d at 706 (holding that a motorist making a lawful turn 1,000 feet before a roadblock does not give rise to a reasonable suspicion of criminal activity unless the motorist's turn or action is coupled with other articulable facts); *State v. Talbot*, 792 P.2d 489, 490 & 495 (Utah Ct. App.1990) (declining to adopt the position that avoiding a roadblock creates an articulable suspicion for a stop where vehicle made an abrupt turn 1,320 feet from roadblock), *disapproved on other grounds by State v. Lopez*, 873 P.2d 1127 (Utah 1994); *Bass v. Commonwealth*, 259 Va. 470, 525 S.E.2d 921, 925 (2000) (holding that there was no reasonable suspicion to stop motorist's vehicle where he made a legal U-turn about 500 feet from roadblock). "Conversely, the closer a motorist is to a roadblock when he or she turns, the more objectively reasonable it may be to infer the turn was made out of a consciousness of guilt." *Lester*, 148 F.Supp.2d at 603. *See, e.g., Snyder v. State*, 538 N.E.2d 961, 963 & 965–66 (Ind.Ct.App. 1989) (reasonable suspicion of criminal activity existed where turn, in combination with officer's experience, was made about 300 feet from roadblock); *Steinbeck v. Commonwealth*, 862 S.W.2d 912, 912 & 914 (Ky.Ct. App.1993) (holding that motorist's turn about

300 feet away from checkpoint, coupled with deputy sheriff's experience in similar instances, the time of day, and nature of the roadway onto which motorist turned, constituted specific, reasonable, and articulable facts which allowed sheriff to draw inference sufficient to form reasonable suspicion that motorist might have been engaging in criminal activity); *State v. Thill*, 474 N.W.2d 86, 86 & 88 (S.D.1991) (holding that motorist's turnabout approximately 350 feet away from roadblock and his "subsequent circuitous route" constituted reasonable suspicion that motorist was in violation of the law).

As to the second factor, pertaining to notice of the roadblock, the issue "whether a notice was posted is relevant to the assessment of a driver's scienter or guilt." *Lester*, 148 F.Supp.2d at 603. *See, e.g., Howard*, 621 A.2d at 807 (considering "the lack of an identifiable way for a police officer to determine whether motorists 1,000 feet away from the checkpoint truly had notice of what lay ahead to be significant" in holding that there was no reasonable and articulable suspicion which justified seizure of defendant and her vehicle); *State v. Hester*, 245 N.J.Super. 75, 584 A.2d 256, 256 & 259–60 (App.Div.1990) (remanded for further findings to determine, *inter alia*, "what notice was given to motorists of the presence or purpose of the roadblock" where motorist made a U-turn 300 to 400 feet from the roadblock); *Talbot*, 792 P.2d at 493 n. 8 (noting that, although "the evidence supports that defendant perceived official vehicles positioned on the road some distance in front of him, it is far from clear that he recognized those vehicles to be employed in a roadblock as opposed to ... an accident investigation" in light of the fact that defendant made turn 1,320 feet before roadblock).

As to the third factor, regarding the motorist's manner in operating his or her vehicle, "unsafe, erratic driving is thought to militate towards a finding of reasonable suspicion." *Lester*, 148 F.Supp.2d at 604. *See, e.g., Foreman*, 527 S.E.2d at 922 (officer's observation of driver's "quick left turn" and subsequent "abrupt" turn immediately prior to passing checkpoint's sign giving notice of checkpoint was sufficient to raise reasonable

and articulable suspicion to justify stop); *Commonwealth v. Eaves*, 13 Va.App. 162, 408 S.E.2d 925, 927 (1991) (reasonable suspicion arose where motorist made abrupt turn before a roadblock coupled with officer's four and one-half years of experience of stopping other drivers who had turned to avoid checkpoints and were subsequently found to be in violation of legal regulations).

As to the fourth factor, relating to the arresting officer's experience, other jurisdictions "give weight to an officer's inference based on his experience." *Lester*, 148 F.Supp.2d at 604. For example, the Indiana Court of Appeals has stated:

> If police officers stationed at roadblocks were not permitted to stop such [evasive] drivers, the very drivers the police seek to deter could flagrantly avoid the roadblocks and the stops would lose their deterrent value. *Trooper Maxwell testified that he had pursued and stopped drivers on numerous occasions who sought to avoid roadblocks and inevitably those drivers had suspended or expired licenses, or some other violation of the law. His experience gave him specific and articulable facts and inferences drawn therefrom to form a reasonable suspicion that [the defendant] was committing a crime.* Such might not always be the case when an officer sees a driver avoid a police roadblock. Likewise, a driver who simply turns off the road before entering the roadblock may not give rise to a reasonable suspicion, unless coupled with other articulable facts such as erratic driving or traffic violations. A finding of a reasonable suspicion must be determined on a case by case basis.
>
> The alternative is to tell police officers that[,] in spite of their experience, they may not infer from a driver's attempt to avoid a roadblock that the driver is very likely engaged in the commission of a crime. Such a rule would seem to tell police officers to "ignore reality."
>
> . . . .
>
> A rule prohibiting police officers from pursuing drivers who evade roadblocks is unnecessary so long as the officer, by virtue of experience and training, has reason-

able and articulable facts upon which his suspicion is based—not mere hunches or speculation.

*Snyder*, 538 N.E.2d at 965–66 (citations omitted) (emphasis added); *see also Stroud v. Commonwealth*, 6 Va.App. 633, 370 S.E.2d 721, 722–23 (1988) (holding that officer was justified in stopping defendant's vehicle in light of his testimony that, based on his eleven years' experience, defendant's action in making a turn 100 to 150 feet away from roadblock indicated that defendant was likely "unlicensed or otherwise in violation of the law").

Finally, as previously stated, any other circumstances that would indicate the motorist was intentionally avoiding a roadblock to evade arrest or detection may be considered in determining whether an officer had reasonable suspicion to effect an investigatory stop on a vehicle. *Binion*, 900 S.W.2d at 706. For example, in *Steinbeck*, the defendant was driving his truck from Cairo, Illinois to his home in Ballard County, Kentucky at approximately 3:15 a.m. 862 S.W.2d at 912. Local law enforcement officials had set up an intoxication checkpoint about 300 feet from the Kentucky end of the Cairo Bridge. *Id.* The police had turned on the emergency lights on their vehicles, making them clearly visible from the Kentucky end of the bridge. *Id.* As the defendant exited the bridge, he activated his turn signal and made a left-hand turn onto East Cairo Landing Road, an unpaved country road with no visible structures or housing along its route. *Id.* After observing the defendant turn onto East Cairo Landing Road, Deputy Sheriff Cooper got into his cruiser and followed the defendant. *Id.* Cooper stopped the defendant's vehicle approximately 225 to 300 feet below the bridge. *Id.* Cooper subsequently administered two field sobriety tests which the defendant failed. *Id.* A "pat down" search also revealed a small vial of cocaine in the defendant's pocket. *Id.* Consequently, the defendant was charged with driving under the influence and possession of cocaine. *Id.* The defendant entered a conditional plea, preserving the issue of suppression for appeal. *Id.*

On appeal, the defendant contended that the trial court erred by failing to suppress the evidence seized inasmuch as the "arresting officer had no articulable and reasonable suspicion that [he] had violated the law prior to the stop." *Id.* at 912–13. The defendant argued, and it appeared to be conceded by the Commonwealth of Kentucky (the Commonwealth) that "he was not weaving in the roadway, speeding, or in any other way violating a traffic law." *Id.* at 913. The only ground claimed by Cooper "for the pursuit and stop of [the defendant] was his belief that [the defendant] was attempting to avoid the checkpoint due to intoxication." *Id.* Although the defendant asserted that "the fact that a car turns in a manner to avoid a roadblock, standing alone, is insufficient to create a reasonable suspicion to justify a stop," *id.* (citations omitted), the Commonwealth countered "that there were reasons in addition to the mere turning prior to the checkpoint which created an articulable and reasonable suspicion of criminal activity." *Id.* Specifically, after testifying that he had set up several checkpoints at the same location, Cooper testified that, in his experience as a deputy sheriff, he has noticed vehicles turning onto East Cairo Landing Road before and that those vehicles turned off onto the road in order to "avoid coming through the road check[.]" *Id.* Cooper further testified that "every road check [he has] been involved[,] every vehicle that turns there[, *i.e.*, the East Cairo Landing Road,] the driver has been drinking alcohol[.]" *Id.* In addition to Cooper's past experience, the Commonwealth argued that "the existence of a reasonable suspicion is supported by the uninhabited and unpaved road onto which [the defendant] turned and the early morning hour at which time the incident occurred." *Id.* The Kentucky Court of Appeals (the court of appeals) agreed with the Commonwealth, holding that the defendant's

> turn away from the sobriety checkpoint, coupled with [Cooper]'s experience in similar instances, the time of day, and the nature of the roadway onto which [the defendant] turned[ ] constitute specific, reasonable, and articulable facts which allowed the police officer to draw an inference sufficient to form a reasonable

suspicion that the driver might have been engaging in criminal activity.

*Id.* at 914. Moreover, the court of appeals relied on the Indiana Court of Appeal's decision in *Snyder* for the proposition that the effectiveness of intoxication checkpoints would be reduced if motorists are permitted to avoid them: "If police officers stationed at roadblocks were not permitted to stop such [evading] drivers, the very drivers the police seek to deter could flagrantly avoid the roadblocks and the stops would lose their deterrent value." *Id.* (citation omitted).

On the other hand, in *Murphy*, the police were operating a permit and decal checkpoint in the 1800 block of Belt Boulevard in Richmond, Virginia. 384 S.E.2d at 126. Officer Katz, in his capacity as the "chase car," witnessed the defendant driving his truck toward the checkpoint. *Id.* When the truck was about 350 feet from the checkpoint, the driver made "a normal and legal right turn onto Angela Drive, a dead end street with apartments facing onto it." *Id.* Katz "acknowledged that nothing distinguished the operation of [the defendant]'s truck from the actions of any driver who simply intended to turn onto Angela Drive." *Id.* Katz subsequently activated his lights and pursued the turning truck, eventually stopping the truck. *Id.* When the defendant exited the truck, Katz recognized him as having a suspended operator's license. *Id.* Upon discovering that the defendant had been adjudged a habitual offender, the defendant was arrested. *Id.* At trial, Katz testified that, in the four and one-half years he had worked roadblocks, he had pursued about twenty vehicles where the driver apparently attempted to avoid the roadblock. *Id.* at 127. Katz, however, did *not* offer any evidence "of how many of those operators had suspended licenses, were habitual offenders, or were involved in criminal wrongdoing." *Id.* The trial court held that the investigatory stop was lawful, based upon reasonable suspicion of criminal wrongdoing, and found the defendant guilty of driving after having been declared a habitual offender. *Id.*

On appeal, the Virginia Court of Appeals (the appellate court) reversed, concluding that "the act of a driver in making a lawful right turn 350 feet before a roadblock does not give rise to a reasonable suspicion of criminal activity unless the driver's turn or action is coupled with other articulable facts, such as erratic driving, a traffic violation, or some behavior which independently raises suspicion of criminal activity." *Id.* at 128 (citations omitted). The appellate court apparently determined that there were no "other articulable facts" from the record and, therefore, reversed the conviction and dismissed the charges. *Id.* at 128–29. Similarly, in *Rocket*, the New York Justice Court held that a defendant's lawful right-hand turn onto *a road with residences and businesses* prior to reaching an intoxication checkpoint, in and of itself, did not provide police with an articulable reason for an investigatory stop. 594 N.Y.S.2d at 569–70.

Considering the totality of the circumstances in the instant case, I believe that the evidence establishes sufficient specific and articulable facts upon which to base a reasonable suspicion that Heapy avoided the checkpoint to evade arrest or detection. It is undisputed that Heapy passed the second sign warning motorists of an impending intoxication checkpoint, which was situated 250 feet from the checkpoint area itself. As such, it is clear that Heapy was *less than 250 feet away* from the checkpoint when he made his right turn onto Mehameha Loop. Moreover, it is undisputed that two four-foot-by-four-foot fluorescent orange signs provided notice of the impending checkpoint to southbound motorists on Mokulele Highway and that Heapy passed both signs prior to making his turn. And, the district court's unchallenged finding indicates that the large lighting tower illuminating the checkpoint and the flag officer were fully visible from the intersection of Mokulele Highway and Mehameha Loop. Finding of Fact (FOF) No. 17.

Although Officer Correa did not observe a "suspicious driving pattern" and Heapy's "turn was not effected in an illegal manner," FOF No. 18, other circumstances, namely, the nature of Mehameha Loop and the surrounding area, reasonably indicated that Heapy was intentionally avoiding the roadblock to evade arrest or detection. Specifi-

**312**

cally, Officer Correa testified that "Mehameha Loop is approximately a quarter of a mile long which terminates with a bright yellow, pipe metal[ ] gate blocking the roadway" and "is surrounded on both sides by sugarcane fields." As such, "it was clear that [one] couldn't drive on to the rest of Mehameha Loop." The metal gate appears to cut off the remainder of Mehameha Loop, which apparently led to a "newly paved" cane field road. The public is not allowed to travel on the cane field road. The only structure located on Mehameha Loop is an animal shelter, which was not open for business at the time Heapy turned onto Mehameha Loop. Officer Correa further testified that, "[b]eyond the [a]nimal [s]helter[,] there is nothing[ ] but the blocked portion of the roadway and the cane haul road and sugar canefields. *There's nothing down there, so there's no real reason to be on that road.*" (Emphasis added.) Officer Correa also did not observe any other vehicle entering Mehameha Loop prior to Heapy's vehicle and noted that Heapy *"did not appear to be changing course or speed and continued driving toward the gate"* once he made the turn onto Mehameha Loop. FOF No. 25 (emphasis added). Moreover, Officer Correa waited for Heapy to pass the closed animal shelter and its parking lot *before* he activated his emergency lights in order to effect an investigatory stop. FOF No. 26.

Finally, I believe Officer Correa's experience also "gave him specific and articulable facts and inferences drawn therefrom to form a reasonable suspicion that [Heapy] was committing a crime." *Snyder*, 538 N.E.2d at 965. The district court entered the following findings relating to Officer Correa's experience:

2. Officer Correa has been employed with the Maui Police Department [ (MPD) ] for twelve years and is currently assigned [to] the traffic division[.]

3. Officer Correa was formerly a member for the DUI Task Force unit for four years[.]

4. Officer Correa has participated in approximately 50 intoxication checkpoints.

5. Officer Correa estimated that he has been assigned the "chase car" position approximately 20 times[.]

6. Officer Correa indicated that he has effected approximately 40 stops on cars that attempted to avoid the intoxication checkpoint[.]

7. That **in every case** the individual avoiding the checkpoint was either intoxicated or was violating the law in some other way such as[ ] not having vehicle insurance or [a] driver[']s license[ ] or having an outstanding warrant[.]

(Bold and underscored emphases added.) Consequently, I believe that Officer Correa's experience is more closely akin to Trooper Maxwell's and Deputy Sheriff Cooper's experience as described in *Snyder* and *Steinbeck*, respectively, as opposed to Officer Katz's experience as set forth in *Murphy*.[3] Moreover, Officer Correa testified on cross examination that he did not see Heapy looking at a map, but recalled Heapy informing him that he was lost once he stopped Heapy. On redirect examination, Officer Correa testified

3. I note that the plurality itself cites to *Murphy's* conclusion that "the act of a driver in making a lawful right turn 350 feet before a roadblock does not give rise to a reasonable suspicion of criminal activity unless the driver's turn or action is coupled with other articulable facts, such as ... some behavior which independently raises suspicion of criminal activity." Plurality at 292 n. 9, 151 P.3d at 773 n. 9 (citing *Murphy*, 384 S.E.2d at 128) (internal quotation marks and emphasis omitted). Specifically, the plurality states that Heapy's "turn was not 'coupled with' any 'behavior which independently raise[d] suspicion of criminal activity,' for it cannot be said that lawfully driving down a road 'independently raises suspicion of criminal activity.'" Plurality at 292 n. 9, 151 P.3d at 773 n. 9 (some internal quotation marks, citation, and emphasis omit-

ted). The factual circumstances in *Murphy*, however, are clearly distinguishable from the facts in the instant case. Most notably, as discussed above, the nature of Mehameha Loop, the surrounding area, and Heapy's driving toward the metal gate without changing course or speed is clearly distinguishable from the road at issue in *Murphy*, that is, Angela Drive, a dead end street *with apartments* facing onto it. Consequently, I believe that there are other articulable facts from the record in this case that "give rise to a reasonable suspicion of criminal activity." *Murphy*, 384 S.E.2d at 128 (stating that, "[i]n determining whether an 'articulable and reasonable suspicion' justifying an investigatory stop of the vehicle exists, courts must consider 'the totality of the circumstances—*the whole picture*'") (citations omitted) (emphasis added).

that, in his experience, "[l]ost people never *avoid* [checkpoints]" because "[they] come to the police for directions." (Emphasis added.) In my view, the district court clearly examined the totality of the circumstances in reaching its determination that Officer Correa indeed had specific and articulable facts to justify the investigative stop, stating:

In this case, the evidence was that in two hours of moderate traffic the only vehicle that turned onto Mehameha Loop was [Heapy's] vehicle. *That, again, there was no reason to turn onto that Mehameha Loop.* It went into a canefield. *There was no good reason to turn on it.* And if someone was lost they could have simply stopped and asked the police officers who were there under considerable lighting where they were.

It seems to me that there is reasonable grounds for suspicion on the part of the officer that Mr. Heapy was indeed avoiding the roadblock, and that, therefore, he had the—right to stop Mr. Heapy and investigate further. He did not execute any stop of—of Mr. Heapy until it was clear that he was—had gone pas[t] the [a]nimal [s]helter and that he was just turning into a canefield. *That he was not just turning around.*

(Emphases added.)

Notwithstanding the logic behind the district court's ruling, the plurality devotes a significant portion of its opinion to the proposition that, "in stopping vehicles turning in advance of the checkpoint, the procedure [instituted by MPD in this case] exceeded the authority granted to the police to establish roadblocks under HRS §§ 291E–19 and –20 (Supp.2005)." Plurality at 286, 151 P.3d at 767 (footnote omitted). Specifically, the plurality maintains that HRS §§ 291E–19 and –20 "do not authorize, as part of a roadblock procedure, a stop of a vehicle operated lawfully that turns in advance of the actual checkpoint." Plurality at 300, 151 P.3d at 781. However, in the instant case, Heapy, on appeal, does not challenge *per se* the propriety of the police establishing roadblocks under HRS §§ 291E–19 and 20. In fact, at the hearing on the motion to suppress, the prosecution and Heapy's counsel *agreed* that

Heapy was "*only contesting the reasonable suspicion aspect of the [investigatory] stop* [.]" (Emphasis added.) In addition, at the conclusion of the hearing, the following colloquy ensued:

[HEAPY'S COUNSEL]: [T]here's been no evidence in this case that the State was in compliance with [HRS § ] 291E–20.

THE COURT: Okay. I understand.

[THE PROSECUTION]: There's no—no evidence to the contrary either, your Honor.

THE COURT: Yeah. Yeah.

[THE PROSECUTION]: *That was not an issue.*

(Emphasis added.) Thus, under the circumstances of this appeal, I would decline to consider any theories not advanced by Heapy. *See Pulawa v. GTE Hawaiian Tel,* 112 Hawai'i 3, 22, 143 P.3d 1205, 1224 (2006) (declining to consider any theories not advanced by the appellants). *See, e.g., Binion,* 900 S.W.2d at 704 n. 1 (determining that, inasmuch as the appellant "ha[d] not challenged the *per se* constitutionality of driver's license roadblocks," it "need not decide this issue"); *Murphy,* 384 S.E.2d at 129 n. 3 (concluding that, because the defendant did "not challenge the validity of the roadblock [at issue in the case], the constitutionality of required nondiscretionary use of 'chase cars' to stop every turning vehicle within a certain radius in a roadblock procedure is not before [this court]").

Moreover, the plurality relies on the National Highway Traffic Safety Administration [NHTSA]'s "Guide," entitled "The Use of Sobriety Checkpoints for Impaired Driving Enforcement" [hereinafter, the Guide]. Plurality at 302–05, 151 P.3d at 783–86. The plurality, however, essentially disregards the fact that Heapy's counsel unsuccessfully attempted to enter the Guide as evidence at the hearing on the motion to suppress. Indeed, after the prosecution objected to defense counsel's attempt to enter the Guide as evidence, the district court sustained the prosecution's objection on the bases that the Guide was not relevant and that it did not fall "within any exception to the hearsay rule." And, Heapy does not challenge the foregoing ruling on appeal. As such, I would decline to

**314**

consider the Guide under the circumstances of this appeal. *See, e.g., State v. Gella,* 92 Hawai'i 135, 141 n. 7, 988 P.2d 200, 206 n. 7 (1999) (declining to address an issue because none of the parties raised such issue on appeal).[4]

The plurality also relies on *State v. Talbot,* 792 P.2d 489 (Utah Ct.App.1990), for the proposition that "[t]he majority of jurisdictions which have addressed the issue of flight have held that the mere act of avoiding confrontation does not create an articulable suspicion." Plurality at 294, 151 P.3d at 775 (internal quotation marks and citations omitted). However, as indicated by the South Dakota Supreme Court in *Thill:*

> Notwithstanding the general freedom to avoid police confrontation, we find the avoidance of the police roadblock *in this instance* was sufficient to create an articulable and reasonable suspicion of criminal activity. Automobiles and their use on state roads are the subject of significant state regulation (*e.g.* [,] licensing, registration).... And while people are not shorn of their Fourth Amendment protection when they step ... into their automobiles, [*Delaware v.] Prouse,* 440 U.S. [648,] 663[, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)], their actions on the road become subject to increased state regulation and restriction. Consequently, actions taken on the road, the character of which would be innocent in another context, may well give rise to an articulable and reasonable suspicion of a violation of the law respecting the use or ownership of an automobile.

*Thill,* 474 N.W.2d at 88 (emphasis added); *see also Metz,* 602 A.2d at 1333–34 (same). Thus, in light of the foregoing, I believe that Heapy's turn onto Mehameha Loop less than 250 feet from the checkpoint, coupled with

the notice of the checkpoint, the nature and surrounding area of Mehameha Loop, and Officer Correa's prior experience, "constitute specific, reasonable, and articulable facts which allowed [Officer Correa] to draw an inference sufficient to form a reasonable suspicion that [Heapy] might have been engaging in criminal activity." *Steinbeck,* 862 S.W.2d at 914.

Lastly, I must reiterate that the effectiveness of intoxication checkpoints would be reduced if motorists are permitted to avoid them. As previously mentioned,

> [i]f police officers stationed at roadblocks were not permitted to stop such [evasive] drivers, the very drivers the police seek to deter could flagrantly avoid the roadblocks and the stops would lose their deterrent value....

> The alternative is to tell police officers that[,] in spite of their experience, they may not infer from a driver's attempt to avoid a roadblock that the driver is very likely engaged in the commission of a crime. Such a rule would seem to tell police officers to "ignore reality."

*Snyder,* 538 N.E.2d at 965–66. In other words, "[c]ommon sense draws one to the conclusion that permitting motorists to choose whether they desire to cooperate with a checkpoint will reduce its effectiveness, detract from its deterrent effect, and, on occasion, create safety hazards." *Hester,* 584 A.2d at 259. Furthermore, as the North Carolina Supreme Court logically recognized,

> [i]t is obvious that a law-enforcement agency cannot make impaired driving checks of drivers of vehicles on highways unless such vehicles can be stopped. Certainly, the purpose of any checkpoint and [statutes governing the establishment, organization,

---

4. The plurality, however, states that "[t]he argument that [Heapy] failed to raise on appeal HRS §§ 291E–19 and –20, and the exclusion of the Guide into evidence, is misplaced." Plurality at 303, 151 P.3d at 784. The plurality explains that

> [a]ny exposition of the case law in our jurisdiction and from other jurisdictions would be incomplete and misleading without a contextual reference to the roadblock statutes and the Guide, which have their genesis in the constitutional text prohibiting unreasonable seizures.

Plurality at 303, 151 P.3d at 784 (footnote omitted). Stated differently, the plurality essentially takes the position that this court must "scour the universe" in order to avoid a "misleading" opinion, despite the fact that Heapy does not challenge the propriety of the police establishing roadblocks under the relevant statutes nor the district court's ruling to exclude the Guide as evidence. In my view, the plurality's "standard" promotes the appellate courts becoming advocates for the appellants, a result that is untenable.

and management of impaired driving checkpoints] would be defeated if drivers had the option to legally avoid, ignore or circumvent the checkpoint by either electing to drive through without stopping or by turning away upon entering the checkpoint's perimeters. Further, *it is clear that the perimeters of the checkpoint or the area in which checks are conducted would include the area within which drivers may become aware of its presence by observation of any sign marking or giving notice of the checkpoint.* Therefore, we hold that it is reasonable and permissible for an officer to monitor a checkpoint's entrance for vehicles whose drivers may be attempting to avoid the checkpoint, and it necessarily follows that an officer, in light of and pursuant to the totality of the circumstances or the checkpoint plan, may pursue and stop a vehicle which has turned away from a checkpoint within its perimeters for reasonable inquiry to determine why the vehicle turned away.

*Our state's interest in combating intoxicated drivers outweighs the minimal intrusion that an investigatory stop may impose upon a motorist under these circumstances.*

*Foreman,* 527 S.E.2d at 924–25 (internal quotation marks omitted) (emphases added). Likewise, I believe that our state's interest in combating intoxicated motorists, as well as our state's interest in protecting the safety of the public, outweighs the minimal intrusion that an investigatory stop may impose upon a motorist under the circumstances of the present case. *See State v. Ferreira,* 133 Idaho 474, 988 P.2d 700, 706 (Ct.App.1999) (recognizing that the "state's interest in stopping drunk driving is compelling, because protecting citizens from life-threatening danger is a paramount concern") (internal quotation marks and citation omitted); *State v. Johnson,* 130 N.M. 6, 15 P.3d 1233, 1239 (2000) (stating that "the public's interest in deterring individuals from driving while intoxicated is compelling") (internal quotation marks and citation omitted); *cf. McCloskey v. Honolulu Police Dep't,* 71 Haw. 568, 576, 799 P.2d 953, 958 (1990) (stating that protecting the safety of the public is a compelling interest served by the police department's

drug testing program and, thus, holding that such drug testing program did "not violate *our* constitution[,]" specifically, article I, sections 6 and 7) (emphasis added). Accordingly, I would affirm the district court's March 18, 2005 judgment.